**Kalima JENKINS, et al., Plaintiffs,**

v.

**STATE OF MISSOURI, et al., Defendants.**

**No. 77–0420–CV–W–4.**

United States District Court, W.D. Missouri, W.D.

June 14, 1985.

On Pending Motions June 16, 1986.

Arthur A. Benson, II, Benson & McKay, Kansas City, Mo., and James S. Liebman, and Theodore M. Shaw, NAACP Legal Defense & Education Fund, New York City, for plaintiffs.

James Borthwick, Shirley Keeler, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., and Allen R. Snyder, Hogan & Hartson, Washington, D.C., for defendant KCMSD.

Bartow Farr, III, Onek, Klein & Farr, Washington, D.C. and Ann Wheeler, Asst. Atty. Gen., Jefferson City, Mo., for defendant State of Mo.

Michael Gordon, Kansas City, Mo., for intervenor Amer. Fed. of Teachers.

## MEMORANDUM OPINION

RUSSELL G. CLARK, Chief Judge.

### INTRODUCTION

The function of a remedial plan in a school desegregation setting is to make the constitutional ideal of equal justice under the law a "living truth." *Cooper v. Aaron,*

358 U.S. 1, 20, 78 S.Ct. 1401, 1410, 3 L.Ed.2d 5 (1958). The basic remedial principle, repeatedly articulated by the courts in school desegregation cases, is that "the scope of the remedy is determined by the nature and extent of the constitutional violation." *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974) (Milliken I); *Columbus Board of Education v. Penick*, 443 U.S. 449, 465, 99 S.Ct. 2941, 2950, 61 L.Ed.2d 666 (1979); *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 420, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851 (1976); *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 15–16, 91 S.Ct. 1267, 1275–76, 28 L.Ed.2d 554 (1971). Further, the goal of the remedy is to prohibit new violations and eliminate the continuing effects of prior violations. *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965); *Keys v. School District No. 1*, 413 U.S. 189, 200, 93 S.Ct. 2686, 2693, 37 L.Ed.2d 548 (1973); *Green v. County School Board*, 391 U.S. 430, 437–38 and n. 4, 88 S.Ct. 1689, 1693–94 and n. 4, 20 L.Ed.2d 716 (1968).

The principles that have guided this Court in implementing a desegregation plan for the KCMSD are clear. "In fashioning, and effectuating (desegregation) ... decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs." *Brown v. Board of Education*, 349 U.S. 294, 300, 75 S.Ct. 753, 756, 99 L.Ed. 1083 (1955) (Brown II). However, a consideration of those practicalities does not mean that the vindication of constitutional rights can be denied on "any theory that it is less expensive to deny than afford them." *Watson v. Memphis*, 373 U.S. 526, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963).

Further, the goal of a desegregation decree is clear. The goal is the elimination of all vestiges of state imposed segregation. In achieving this goal, the district court may use its broad equitable powers,

recognizing that these powers do have limits. Those limits include the nature and scope of the constitutional violation, the interests of state and local authorities in managing their own affairs consistent with the constitution, and insuring that the remedy is designed to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct. *Morrilton School District No. 32 v. U.S.*, 606 F.2d 222, 229 (8th Cir.1979), cert. denied, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980).

In reviewing the plans presented by the parties, the evidence presented during the hearing, and this Court's findings of constitutional violations, it is clear that "[t]he remedial portion of a school desegregation case is unlike that of any other variety of litigation and conceivably can surpass the liability portion in terms of complexity and duration." *Armstrong v. Board of School Directors of City of Milwaukee*, 616 F.2d 305, 324 (7th Cir.1980). Therefore, the establishment of liability is only the beginning. "The precise remedy does not follow logically from the determination of liability, but rather reflects a careful reconciliation of the interests of many affected members of the community and a choice among a wide range of possibilities. The nature of the litigation does not lend itself to complete success by one side or the other." *United States and South End Education Committee v. Board of Education of Waterbury*, 605 F.2d 573, 576–77 (2d Cir.1979).

This Court recognizes that implementation of this plan will be difficult. "The pain of transition is an unfortunate, but inevitable result of deliberate policies which have isolated black Americans from the schools ... of white Americans." *United States v. School District of Omaha*, 521 F.2d 530, 546 (8th Cir.), cert. denied, 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975).

Since the minority students in the KCMSD are the victims of racial discrimination which was mandated by the Constitution and statutes of the State of Missouri, it is only equitable to place the greatest

burden of removing the vestiges of such discrimination and the continuing effects of same on the State rather than on those who are the victims.

"All, regardless of race or class or economic status, are entitled to a fair chance and to the tools for developing their individual powers of mind and spirit to the utmost. This promise means that all children by virtue of their own efforts, competently guided, can hope to attain the mature and informed judgment needed to secure gainful employment, and to manage their own lives, thereby serving not only their own interests but also the progress of society itself." *A Nation At Risk: The Imperative for Educational Reform* at p. 1 (1983) (hereinafter cited as *A Nation at Risk*). Segregation in the KCMSD has resulted in this promise going unkept.

Measures requiring educational improvements have been incorporated into many desegregation remedies. *Milliken v. Bradley*, 433 U.S. 267, 279–88, 97 S.Ct. 2749, 2756—61, 53 L.Ed.2d 745 (1977) (*Milliken II*); *Morgan v. Kerrigan*, 530 F.2d 401, 427–30 (1st Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2648, 49 L.Ed.2d 386 (1976); *Tasby v. Wright*, 520 F.Supp. 683, 741–43 (N.D.Tex. 1981); *Oliver v. Kalamazoo Board of Education*, 640 F.2d 782, 787 (6th Cir.1980); *United States v. Board of School Commissioners*, 506 F.Supp. 657, 671–72 (S.D.Ind. 1979), *aff'd in part, reversed in part*, 637 F.2d 1101 (7th Cir.), *cert. denied*, 449 U.S. 838, 101 S.Ct. 114, 66 L.Ed.2d 45 (1980); *Liddell v. Board of Education*, 491 F.Supp. 351, 357 (E.D.Mo.1980), *aff'd*, 677 F.2d 643 (8th Cir.), *cert. denied*, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 629 (1981) (*Liddell III*). The use of ancillary programs to improve the educational quality of a school district in a desegregation remedy is based upon the federal district's "duty to render a decree which will so far as possible eliminate the discriminatory effects of the past...." *Haney v. County Board of Education*, 429 F.2d 364 (8th Cir.1970), *quoting, Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965). No party to this case has suggested that this plan should

not contain components designed to improve educational achievement. In fact, it is "appropriate to include a number of properly targeted educational programs in a desegregation plan" (State Plan at 5). This is true because "individuals in our society who do not possess the levels of skill, literacy, and training essential to this new era will be effectively disenfranchised, not simply from the material rewards that accompany competent performance, but also from the chance to participate fully in our national life." *A National at Risk* at p. 7. The difficult question which remains is, which programs are appropriate to remedy the ill effects of the unconstitutional segregation and to attract and maintain non-minority enrollment.

Segregation has caused a system wide *reduction* in student achievement in the schools of the KCMSD (testimony of Dr. Daniel Levine, testimony of Dr. Eugene Eubanks at pp. 22,376–79). Test results from the Iowa Test of Basic Skills in grades 1 through 6 show that there are only a few elementary schools of the 50 in the KCMSD which are presently performing at or above the national norm in reading and mathematics. This is especially true in regard to the basic skill of reading (P.Ex.3781). (The Court is aware that there may be substantial improvement on the tests for the current year.) The testimony of all the educational experts including Dr. Daniel Levine, Dr. Eugene Eubanks, Dr. Herb Walberg, Dr. Joan Abrams, Carla Santorno, Dr. Joseph Barderick, and Dr. Willis D. Hawley, confirm that this situation is correctable and that the schools in KCMSD, when provided with adequate resources, sufficient staff development, and proper teaching methods, can attain educational achievement results more in keeping with the national norms (see specifically the rebuttal testimony of Dr. Daniel Levine stating that the goal of the KCMSD Plan was to raise the average achievement level for elementary students in the area of reading to the national norms within 4 to 5 years and to bring the passing

rate at the secondary level for the BEST test from 51% to a 90 to 95% pass rate).

Both the State of Missouri and the KCMSD have proposed program components designed to increase student achievement at the elementary and secondary levels (KCMSD Plan at pp. 19–33; State Plan at pp. 16–43, and 108–09). The approach taken by KCMSD on the elementary level includes the implementation of an early language development program (KCMSD Plan p. 22, 23), 24 transition rooms in elementary schools for students who would normally be retained in kindergarten or third grade (KCMSD Plan p. 23, 24), the hiring of additional elementary school counselors and home school liaison officers in all low achieving elementary schools (KCMSD Plan at p. 21), the expansion of computer assisted and computer managed instruction (KCMSD Plan p. 31–34), the implementation of a "Writing to Read" project (a computer program designed for kindergarteners) (KCMSD Plan p. 32), the implementation of a computer home loan program (KCMSD Plan p. 33) and what KCMSD calls an "Effective School" project which would make available up to $100,000 for each elementary school with reading levels below national average (KCMSD Plan p. 21). This means that 41 of the 50 elementary schools in the KCMSD would be receiving these funds (KCMSD Exh. K–95). The Effective School project attempts to address the individual needs of the elementary schools on the school level. Local parents, patrons, teachers and principals would be involved in determining how these resources may be spent in order to increase the student achievement level in that school, especially in regard to reading. A similar program has been implemented in six predominantly minority schools in the KCMSD. It has shown significant promise as a means of remedying many of the educational problems which go hand in hand with racially isolated minority student populations (testimony of Dr. Daniel Levine at pp. 22,132–49, testimony of Dr. Eugene Eubanks at pp. 22,376–79).

The State proposal for improving student achievement on the elementary level is the implementation of an "Instructional Management System." This system is a modification of a teaching approach entitled "Mastery Learning" (State Plan at p. 43). Mastery learning, as defined by Dr. Joan Abrams and Carla Santorno, in testimony during the remedial hearing, is an instructional technique in which the teacher prepares a lesson plan and presents material to the class, following presentation of the material the teacher conducts testing or evaluation to determine which students have mastered the material, then the teacher establishes lesson plans which are more individualized with one group of students receiving enrichment, while the other group of students, who have not yet mastered the material, will receive remedial lessons until they do master the material. This technique has proven successful in school districts undergoing desegregation as well as those which were not (testimony of Dr. Daniel Levine, Dr. Herb Walberg, Dr. Joan Abrams, Carla Santorno).

The KCMSD proposal for improving achievement on the secondary levels includes: the implementation of pre-collegiate courses and career counseling (KCMSD Plan pp. 25–27, 29–30); the implementation of alternative secondary education programs (KCMSD Plan at 27–28), including in-school suspension rooms, transition rooms for the ninth grade, alternative schools for alienated youth, computer laboratories and a reform and reorganization demonstration project similar to the effective elementary school project in which the 18 secondary schools would be budgeted approximately $100,000 per school with the determination as to how those funds should be allocated based upon recommendations of patrons, parents, teachers and the local principal.

The State proposes to implement pre-collegiate courses and an occupational and career education program in the 90% plus black schools (State Plan at 109). No other specific proposals are made by the State as part of an attempt to improve achievement at the secondary education level, however, other components in its plan, as in the

KCMSD Plan, allow for programs which would be aimed at improving achievement.

In addition to these programs to increase student achievement, both the State of Missouri and the KCMSD endorse achieving AAA status, reducing class size at the elementary and secondary level, summer school, full day kindergarten, before and after school tutoring and early childhood development programs.

## IMPROVING STUDENT ACHIEVEMENT

### AAA Achievement

The Missouri State Department of Elementary and Secondary Education (DESE) conducts an annual evaluation of school districts as a part of its ongoing classification and accreditation program. The objective of this program is to provide direction and assistance in the development of quality education in Missouri's public schools (KCMSD Exh. K-69). Under this program Missouri's school districts are classified according to the quality and quantity of the educational programs and services they offer, including such items as teacher qualifications, class size, instructional equipment, library resources, and instructional materials. The highest classification is "AAA." A AAA rating is a designation which communicates to the public that a school system quantitatively and qualitatively has the resources necessary to provide minimum basic education to its students (Dr. Eubanks' testimony at 22,-360).

Presently KCMSD is rated AA and has been so rated since 1977. All other school districts in the Kansas City area are rated AAA (testimony of Dr. Larry Keisker). KCMSD's eligibility for AAA rating is dependent upon improvement in library personnel and resources among KCMSD's elementary schools and secondary schools. Furthermore, the elementary school system is lacking in a minimum number of art, music, and physical education teachers. There is also a need for additional counselors at the elementary and secondary levels in order to reach AAA classification and finally, KCMSD elementary teachers do not have adequate planning time (KCMSD Exh. K-68).

Specifically, the following improvements must be made in order for KCMSD to meet or barely exceed AAA classification standards:

1. *Library Improvement.* KCMSD must hire 13 certified librarians for the elementary school libraries (KCMSD Exh. K-69, testimony of Dr. Eugene Eubanks at p. 22,363, testimony of Dr. Larry Keisker).

KCMSD needs an additional 9 senior high librarians (testimony of Dr. Larry Keisker, KCMSD Exh. K-68, testimony of Dr. Eugene Eubanks at 22,362).

Additional media and library resources are needed at the elementary, junior and senior high school libraries. The total amount of additional resources needed to raise the library and media resources to a AAA standard is $950,000 (testimony of Dr. Larry Keisker, testimony of Dr. Eugene Eubanks at pp. 22,361–362, KCMSD Exh. K-68, State Plan at p. 97, KCMSD Exh. K-95 at p. 6).

2. *Teaching Load and Curriculum.* The AAA standard for elementary teaching load is that "(a)ll teachers shall have planning time scheduled within the school day and shall devote no more than an average of 310 minutes of the six hour day to teaching except that full-time librarians and guidance counselors may devote 360 minutes of the six hour day to those duties." (*Handbook for Classification and Accreditation of Public School Districts in Missouri* at p. 18). Presently KCMSD is not in compliance with this minimum standard (testimony of Dr. Larry Keisker, testimony of Dr. Eugene Eubanks at pp. 22,367–74, KCMSD Exh. K-68). Furthermore, the AAA standard for elementary school curriculum includes a requirement that art and music shall be scheduled and taught at least 60 minutes per week by teachers with the proper subject matter certification or teachers with regular elementary certificates who are supervised by teachers with proper subject

matter certification and that physical education shall be scheduled and taught at least two 30 minute periods per week by teachers with certificates in physical education or by teachers with regular elementary certificates who are supervised by teachers with certificates in physical education. (*Handbook for Classification and Accreditation of Public School Districts in Missouri* at p. 20). KCMSD is presently not in compliance with this AAA standard (KCMSD Exh. K–68, testimony of Dr. Eugene Eubanks at pp. 22,367–68, testimony of Dr. Larry Keisker).

Both the State and KCMSD propose using additional art/PE/music specialty teachers on the elementary level in order to obtain additional planning periods for existing elementary teachers. Presently KCMSD has 48 specialty curriculum teachers with each student receiving 1 art/PE/music session every ten days. There are 20,245 elementary students in KCMSD (KCMSD Exh. K–74). In order to meet the AAA curriculum standards for these three specialty areas, 34 teachers are needed in each of the three areas. Thus there is a need for 102 teachers. Since KCMSD presently employs 48 of these teachers, then a total of 54 additional art/PE/music teachers are needed in order to comply with AAA teaching load standards at the elementary level (testimony of Dr. Eugene Eubanks at p. 22,368–9).

The hiring of 54 additional specialty curriculum teachers would also provide 180 minutes per week of planning time for elementary school teachers. Seventy minutes of planning time per week would still be needed by elementary school teachers in order to reach AAA standards (*Handbook* at p. 18). The State recommends that this additional time could be achieved through shared recess supervision loads. That is, since there are two 15 minute recess periods each day, there is a total of 150 minutes of recess time each week. If two teachers would trade off responsibilities for supervising these recess periods, then each teacher would be given an additional 75 minutes per week of planning time, enough to meet AAA standards when combined with the 180 minutes of planning time provided by the art/PE/music teachers (testimony of Dr. Larry Keisker).

The KCMSD proposes to hire 62 additional teachers in order to fill the planning time remaining.

In order to meet the AAA classification requirements for teaching load at the elementary school level, KCMSD shall hire an additional 31 certified teachers and 31 teacher's aides in order to insure that all teachers have planning time scheduled within the school day and that all teachers should devote no more than an average of 310 minutes of the six hour day to teaching.

3. *Counselors.* The AAA standard for elementary counselors is 1 counselor for every 1,500 students, plus for every major fraction above the 1,500 student level, an additional half-time counselor (*Handbook* at p. 19). Presently KCMSD has no elementary counselors (testimony of Dr. Eugene Eubanks, p. 22,366). Fourteen additional counselors are needed in order to meet AAA standards.

At the secondary level AAA standards require one full-time counselor for every 390 students (*Handbook* at pp. 27, 33). The KCMSD needs an additional four counselors to meet AAA standards (testimony of Dr. Keisker).

The patrons of a school district, especially the parents of potential students of that school district, view a AAA rating as an important factor in measuring the school's ability to educate its students. Achieving AAA classification could be the first step in KCMSD's journey to regain and maintain a quality education program and could serve to assist in attracting and maintaining non-minority student enrollment. Achieving AAA status has been recognized by the Eighth Circuit as a proper component of a desegregation plan. *Liddell v. State of Missouri (Liddell VII)*, 731 F.2d 1294, 1318, *cert. denied*, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984), *Liddell v. State of Missouri, (Liddell VIII)*, 758 F.2d 290, 294 (1985). Therefore, KCMSD

shall hire 13 certified librarians for its elementary school libraries, 9 certified librarians for the senior high school libraries, and purchase $950,000 in additional media and library resources at the elementary, junior and senior high library levels. Furthermore, KCMSD shall hire 18 art certified elementary school teachers, 18 music certified elementary school teachers, and 18 physical education certified elementary school teachers for the purpose of achieving AAA standards in the area of elementary curriculum and assisting in reaching AAA standards in the area of teaching loads. KCMSD shall also hire 31 additional certified elementary school teachers and 31 teachers' aides who shall be used to free up planning time for existing elementary school teachers in order to insure that all teachers have planning time scheduled within the school day and that all teachers should devote no more than an average of 310 minutes of the six hour day to teaching. KCMSD shall hire 14 additional elementary school counselors in order to have one elementary school counselor for every 1,500 students presently enrolled at KCMSD elementary level. KCMSD shall hire an additional four certified counselors at the secondary level. All additional hirings and additional resources purchased under this order which shall enable KCMSD to reach AAA classification status shall be done before and during the 1985/86 school year in order that the new classification ratings issued by the State in the spring of 1986 will reflect the results of this effort. The maximum funds available for achieving AAA status shall be $4,738,-500. No more than $950,000 shall be spent on additional library and media resources. The maximum cost for individual librarians, counselors and teachers, including fringe benefits, shall be $28,000. The maximum cost for individual teacher's aides, including fringe benefits, shall be $9,500. The cost for achieving AAA status, in the maximum amount of $4,738,500, shall be borne equally by the KCMSD and the State of Missouri.

### Reducing Elementary and Secondary School Class Size

■ The Missouri State Board of Education in 1984 stated that "[t]oday, in many schools, the entire educational process is bogged down because so many students have not mastered requisite skills thoroughly and because teachers must spend so much time helping them "catch up." Until we elevate the "floor of achievement" for all students—*at least in terms of basic school skills*—the slowest learners will continue to dictate the pace and content of instruction for all the rest." *Reaching for Excellence* at p. 18 (KCMSD's Exh. K–75). That education process has been further "bogged down" in the KCMSD by a history of segregated education. Too often, as a result, a higher percentage of black students are among the lower achievers. The cost of this under-education is enormous.

> When thousands of our citizens are afforded only inferior educational opportunities, they suffer a loss which can never be compensated and the whole country is subjected to unnecessary social and economic waste.

Robert F. Kennedy, *The Pursuit of Justice,* p. 73 (1964). The Missouri State Board of Education has made a number of recommendations to improve educational opportunities for all Missouri students, including "[i]ncreasing the individual attention and instruction available to students by providing funds to enable school districts to maintain classes no larger than 15 students in kindergarten to grade 3 and no larger than 20 students in basic skill classes in grades 4 through 6." *Reaching For Excellence, supra,* at 21. All of the hearing testimony by experts, board members, and patrons, supports the conclusion that increasing individual attention and instruction will result in giving teachers more manageable teaching loads. Further, if the more manageable teaching loads are accompanied by changes in curriculum materials and methods and adequate staff development, then significant gains in student achievement should result (testimony of Dr. Daniel Levine at pp. 22,333–35, testimony of Dr. Eugene Eubanks at 22,379,

22,400–02, 22,494–505, testimony of Dr. Herb Walberg, testimony of Dr. Joan Abrams, testimony of Dr. Gene Glass, testimony of William Alexander, testimony of Marie Toffey, testimony of Dr. Willis D. Hawley). Reduced class size also serves to increase the likelihood that the KCMSD could maintain and attract non-minority enrollment in the future (testimony of Sue Fulson, testimony of Katherine Rush Thompson). Finally, reduced class size will assist the KCMSD in implementing the quality education components contained in this plan.

Therefore, it is this Court's finding that achieving reduced class size is an essential part of any plan to remedy the vestiges of segregation in the KCMSD. Reducing class size will serve to remedy the vestiges of past segregation by increasing individual attention and instruction, as well as increasing the potential for desegregative educational experiences for KCMSD students by maintaining and attracting non-minority enrollment.

There are 3,081 students in kindergarten sessions with some duplicates due to the all day kindergarten program. There are 100 kindergarten teachers, (a figure which should be multiplied times two in order to account for the morning and afternoon session) (State's Exh.55). The average student-teacher ratio is 18.9 to 1. There are 41 sessions of Chapter I all day kindergarten, each with 15 students, equaling 1,615 students total. Subtracting those students and teachers, a student-teacher ratio average of 19.9 to 1 is reached. There are 1,413 students in kindergarten classes that have more than 22 students for every teacher, the goal established by the KCMSD. Thus, KCMSD must have 64.23 teachers in order to reach the KCMSD reduced class size goal in kindergarten. Since KCMSD presently has 53 teachers, it means an additional 12 teachers are needed at the kindergarten level to reach the KCMSD's reasonable goal of no more than 22 students in kindergarten classes.

There are 8,603 students taught by 388½ teachers in grades 1 through 3 resulting in a student-teacher ratio of 22.14 to 1 (KCMSD Exh. K–56). Of those students 1,369 are in 58 Chapter 1 special classes. Subtracting the Chapter 1 students and teachers from the total number of students and teachers, there are 7,234 students and 272½ teachers, equaling a 26.55 to 1 student-teacher ratio average in grades 1 through 3 (KCMSD Exh. K–56). Of the 50 elementary schools in KCMSD, 22 of these schools have an average student-teacher ratio above the 22 to 1 goal (44%). Furthermore, 240 of the 338 elementary school classrooms have student-teacher ratios in excess of the 22 to 1 student ratio goal (71%) (KCMSD Exh. K–56, testimony of Dr. Eugene Eubanks). Thus, in order for the 7,234 elementary students in grades 1 through 3 who are not in special Chapter 1 classes, to have a reduced class size of 22 students, there is a need for 328.8 teachers. Presently, KCMSD has 272.5 teachers in grades 1 through 3 (KCMSD Exh. K–56, testimony of Dr. Eugene Eubanks). In order to achieve the goal of having no more than 22 students in any classroom in grades 1 through 3, KCMSD will need an additional 56 teachers.

In grades 4 through 6 there are 6,625 students who are taught by 274.5 teachers, equaling an average of 24.1 to 1 student-teacher ratio (KCMSD Exh. K–57). 875 of those students are in 33 special two-teacher classes (K–57). When those students and teachers who are in special classes are subtracted from the totals, there are 5,750 students being taught by 208.5 teachers in grades 4 through 6, yielding a student-teacher ratio of 27.6 to 1. There are 3,102 students in grades 4 through 6 who are presently in classes that exceed the 27 to 1 reasonable student-teacher ratio goal established by KCMSD (K–57). Thus in order to reduce all classes to the 27 to 1 goal established by KCMSD, the district will need 115 teachers. Presently they have 100 teachers teaching those 3,102 students. Therefore, KCMSD needs an additional 15 teachers in order to reduce class size.

There are 5,351 students in the junior high schools of KCMSD. There are 243

teachers at the junior high level. This yields a student-teacher ratio average of 22.02 to 1 (KCMSD Exh. K–58). There are 37,457 student classes at the junior high level. This figure relates to the 1,376 teacher assignments which exist at the junior high level. This means that the student-teacher ratio is 27.2 to 1. However, the more meaningful figure relates to the number of student classes and the number of teachers available. Presently, during an average school day a teacher will have classes in which a total of 154 students are present. There are nine junior highs in KCMSD and in seven of those junior high schools the average teacher has more than 125 students during the day. KCMSD will need an additional 22 junior high teachers in order that no teacher will have more than 125 students total in all classes per day.

There are 8,727 students at the senior high level and 352 teachers. (KCMSD Exh. K–59). This means that the average class size is 24.8 to 1. There are 52,362 student classes and 1,824 teaching assignments which yields a student-teacher ratio of 28.7 to 1. However, the more revealing figure is that there are 52,362 student classes, when divided by the 352 teachers it shows that each teacher, on the average, has 148.76 students each day enrolled in classes they teach during that day (K–59). Furthermore, 8 of the 9 (89%) senior high schools have ratios which are in excess of the 125 student per day goal established by KCMSD. In order to reach that goal KCMSD needs an additional 78 senior high teachers.

Thus, in order to reach the reasonable class size goals established by the KCMSD of no more than 22 students in grades kindergarten through third grade, no more than 27 students in grades four through six and on the secondary level, no more than 125 students per teacher per day, a total of 183 additional teachers will need to be hired. Therefore, it is ordered that beginning with the school year 1987/88 there will be no kindergarten, first, second or third grade classes in the KCMSD with more than 22 students. Further, it is ordered that by the school year 1987/88 there will be no more than 27 students in any classroom in grades four through six in the KCMSD. In addition, it is ordered that by the school year 1987/88 no secondary education teacher in the KCMSD, with the exception of physical education and music teachers, shall be required to teach more than 125 students per day.

Costs for reaching this goal shall be paid for by the State of Missouri. The total costs shall not exceed $12,000,000, with no more than $2,000,000 the first year, $4,000,000 the second year and $6,000,000 the third year. While every effort should be made by the KCMSD to reach these minimal goals as quickly as possible, the goals should not be reached at the expense of hiring less than fully qualified and well trained teachers.

The goals established by this Court are only minimal goals. As the State of Missouri has noted in its pamphlet, *Reaching for Excellence* (KCMSD Exh. K–75), the ideal goal would be to have kindergarten through third grade classes no larger than 15 students and grades four through six with no more than twenty students. The patrons, parents, administration and board of directors of the KCMSD are encouraged by this Court to take whatever actions are necessary to reach for excellence and reduce class size even further than the goals established by this Court. While the funds allocated by this Court for the purpose of reducing class size will provide significant assistance, the financial responsibility for reaching beyond these minimal goals and reaching toward educational excellence must be borne by the patrons of the KCMSD.

### Summer School

█ Both the State of Missouri and the KCMSD propose the implementation of a summer school program as a part of a desegregation plan. The KCMSD Plan (p. 34–35) for summer school has three basic goals. First, it seeks to provide remedial and developmental learning experiences for

elementary and secondary education level students. Next, it seeks to provide reinforcement and enrichment for secondary education students and finally, it seeks to provide a desegregative learning experience at both elementary and secondary levels. The State Plan (p. 88) is strictly a remedial plan in which the KCMSD would continue to operate the elementary summer school program and, in addition, would implement summer school in one junior high and one senior high at a facility which would insure the highest maximum racial mix.

Additional learning time is a key component of any effort to improve the quality of education in a public school system (testimony of Herbert Walberg). Summer school expands the amount of learning time available. Therefore, as a part of an overall effort to improve the academic achievement of students within KCMSD, both as a remedial measure and to maintain and attract non-minority enrollment, a well planned and carefully implemented summer school program at the elementary and secondary levels can be an important component in an overall desegregation plan. In addition, summer school can serve as a means to increase the opportunities for desegregative learning experiences. In the past the KCMSD has operated successful summer school learning experiences in which non-minority enrollment from surrounding school districts, participating with minority enrollment from the KCMSD, were involved (testimony of Dr. Daniel Levine at p. 22,203).

The KCMSD is therefore ordered to conduct a summer school program, beginning in the summer of 1985, for elementary level students who would otherwise have been retained in their present elementary grade, at a cost not to exceed $300 per student, with a maximum total cost of $445,000. KCMSD shall also implement a summer school program at the junior high school level in the summer of 1985, at a cost not to exceed $250 per student with the total cost not to exceed $301,000. This summer school program shall be expanded to include senior high school students and en-

richment and cooperative programs in the summer of 1986 with those items being budgeted at $63,000 for senior high summer school programs and $100,000 for the enrichment and cooperation program. These three programs shall involve at least 1,000 different senior high school students. Costs shall be divided equally between the State of Missouri and the KCMSD.

### *Full Day Kindergarten*

■ Both the State Plan (State Plan at p. 85) and the KCMSD Plan (KCMSD Plan at p. 18) propose a full day kindergarten program. All day kindergartens are presently serving 1,229 KCMSD students in 61 classes (testimony of Dr. Eugene Eubanks at p. 22,441, KCMSD Exh. K–55). The goal under the KCMSD Plan is to provide all day kindergarten throughout the district for all willing to participate. The State Plan would implement all day kindergarten in elementary schools which presently have it but do not serve all students, expand it to *all* students not presently served in 7 primarily black elementary schools, and further expand it to 8 elementary schools but only for those children who rate at or below the 45th percentile in certain areas of the Missouri Kindergarten Inventory of Development Skills (KIDS).

Present experience in KCMSD with the full day kindergarten shows that such a program cannot only provide remediation to those who are victims of past segregation, but will also assist the school district in maintaining and attracting desegregated enrollment and providing integrative experiences at an early age (testimony of Dr. Eugene Eubanks at p. 22,443, testimony of Dr. Daniel Levine at pp. 22,179–181).

As a part of this desegregation plan all day kindergarten shall be offered to all students. In order to implement this program, a program which has been approved by the Eighth Circuit in the St. Louis desegregation case, *Liddell VII*, 731 F.2d at 1317, the district is ordered to hire for the 1985/86 school year up to a total of 39 additional certified kindergarten teachers

at a maximum individual cost, including fringe benefits, of no more than $28,000 annually, for a total cost of not more than $1,092,000. Costs shall be borne equally by the State of Missouri and the KCMSD.

### Before and After School Tutoring

■ Both the State Plan (p. 107) and the KCMSD Plan (pp. 17 and 22) propose the implementation of elementary after school tutoring programs of roughly $104,400. While the State and KCMSD agree on the approximate cost of such a program, the parties disagree over the components which make up such a program.

The State indicates that such a program should be implemented in up to a maximum of 20 of the elementary schools where the enrollment remains 90% or more black after any student reassignment is conducted. The State further limits this program to *after* school and incorporates into it cross-age instruction or peer tutoring, parental instruction, participation by community volunteers, specialized instruction by KCMSD teachers and enrichment programs that will supplement and build upon regular day programs.

The KCMSD program proposes before and after school tutoring for kindergarten through sixth grade, implemented in any elementary school in the district where there is sufficient number of students to warrant such a program (KCMSD Plan pp. 17 and 22).

Similar programs have been found to be a way to not only remedy the vestiges of past segregation but also a means to attract and retain enrollment from non-minority families where both parents work (testimony of Dr. Daniel Levine at pp. 22,-163). Further, cross-age instruction or peer tutoring and parental involvement in the education process are elements which have been successful in other school districts when used to improve academic achievement (testimony of Dr. Gene Glass, testimony of Dr. Willis D. Hawley). Therefore, KCMSD shall implement a before and after school tutoring program in at least ten schools where participation is of a suf-

ficient level to operate the program efficiently, economically and effectively. This program should be operated in grades kindergarten through six and should utilize cross-age instruction, parental instruction, and community volunteers under the overall supervision of certified teachers. Costs for this program shall not exceed $104,400. A proposed budget shall be filed by the KCMSD no later than August 15, 1985. Costs shall be borne equally by the State of Missouri and the KCMSD.

### Early Childhood Development Programs

■ Both the State Plan (p. 44–83) and the KCMSD Intradistrict Plan (p. 17) propose early childhood development programs. The KCMSD's proposal lacks any degree of specificity as to what services will actually be delivered. The State's proposal is very specific in terms of the services to be delivered, and the steps to be taken in implementing each part of the early childhood development program (testimony of Dr. Daniel Levine at pp. 22,167–68).

The State's proposal refers to but does not *specifically* incorporate an early language development component. An early language development program is a "keystone to eventual successful academic achievement." (testimony of Dr. Eugene Eubanks at p. 22,419). Early language development programs have been shown to be extremely successful in Los Angeles and San Diego, California in assuring that a student will be able to make the most of the educational opportunities offered in public schools (testimony of Dr. Daniel Levine at p. 22,169–70, Dr. Eugene Eubanks at 22,419).

The State Plan provides a carefully defined and comprehensive program. Therefore, the State of Missouri's program will be implemented as a part of this desegregation plan. Officials from the State of Missouri and from the KCMSD *shall cooperate* to implement the basic components of the State Plan with modifications of the State Plan in order to insure that it in-

cludes an early childhood language development program and that the State Plan realistically reflects the time constraints and realities of implementing such a program within the KCMSD. Total budget shall not exceed $1,223,348. Costs shall be borne equally by the State of Missouri and the KCMSD.

*Effective Schools*

■ To be effective, changes in the KCMSD aimed at improving student achievement must be planned and implemented at the school level (testimony of Dr. Daniel Levine, Dr. Eugene Eubanks, Sue Fulson, Herbert Walberg, Dr. Joan Abrams, Carla Santorno, Dr. Willis D. Hawley). In fact, if a district and its personnel lack a strong commitment to a program, then the likely result is that the program, if it is implemented at all, will be implemented ineffectively. *See, e.g.,* Vol. VIII P. Berman and M. McLaughlin, *Federal Program Supporting Educational Change, Factors Affecting Implementation and Continuation,* 12–21, 30–31 (1977). Thus, effective change in schools comes from the "bottom up" and not from the "top down." Real educational change takes place only after school administrators and staff, and patrons and parents, have been involved in the planning process and are committed to achieving this change. *See, e.g.,* Fullan and Pomfret, *Research on Curriculum and Instructional Implementation,* 47 Rev.Educ. Research 335, 391 (1977). The effective school project on the elementary level and the reform and reorganization demonstration project on the secondary level, proposals of the KCMSD, serve as clear examples of the growing awareness that public educational institutions are a dynamic system and it is only with the input and commitment of the many groups who have interest and influence in our schools—school board, administration, principal, teacher, parent, patron, and student—that effective change is realized. *See, e.g., Oliver v. Donovan,* 293 F.Supp. 958 (E.D.N.Y.1968) (where the teachers' union resisted the educational components of a desegregation plan be-

cause they felt the nature of the components threatened the teachers' vested interests in traditional policies).

Therefore, since the effectiveness of any program which seeks to improve student achievement is directly related to the degree of involvement of patrons, parents, teachers and administrators at the local school level and since the measure of any desegregation plan is its effectiveness, *Davis v. Board of School Commissioners,* 402 U.S. 33, 37, 91 S.Ct. 1289, 1291, 28 L.Ed.2d 577 (1971), rather than the Court ordering that any additional *specific* program components designed to improve academic achievement be implemented, the KCMSD shall make a determination as to the specific programs to be added. The State of Missouri shall fund such programs aimed at increasing student achievement in the following amounts:

1. For each of the 25 schools with enrollments of 90% or more black:

| | | |
|---|---|---|
| a. | 1985/86 school year | $75,000 each school |
| b. | 1986/87 school year | $100,000 each school |
| c. | 1987/88 school year | $125,000 each school |

2. For each of the remaining 43 schools;

| | | |
|---|---|---|
| a. | 1985/86 school year | $50,000 each school |
| b. | 1986/87 school year | $75,000 each school |
| c. | 1987/88 school year | $100,000 each school. |

The first year these funds shall be spent on components contained in the intradistrict plan submitted by the KCMSD in response to this Court's January 25, 1985 order, such as mastery learning, elementary counselors and home school liaisons, transition rooms, pre-collegiate curriculum, alternative secondary school units and arrangements, occupational and career education, computer labs and computer assisted and managed instruction. Decisions on how the first year funds shall be spent will be made by the KCMSD school board of directors. However, in subsequent years the decisions will be based upon a plan developed by the existing school advisory committees. These committees, made up of parents, teachers and the principal at each school (testimony of Sue Fulson), shall make recommendations to the Board of Education in regard to how these funds

should be spent at the school which they represent. The Board of Education shall review and take action as to the appropriateness of these expenditures and ways in which costs can be reduced by integrating common efforts among the schools. Criteria governing these funds are as follows:

1. These funds may only be spent to expand or implement educational improvement components presently contained in the intradistrict plan submitted by the KCMSD in response to this Court's order of January 25, 1985; and

2. The programs upon which these funds may be spent must be for the sole purpose of improving student achievement as measured by the Iowa Test of Basic Skills and the Basic Essential Skills Test (BEST).

In this way the responsibility for determining what educational efforts are best suited to individual schools will be in the hands of those individuals with the knowledge, expertise and information necessary to make the best judgments. By October 15, 1985, in a cooperative effort between the KCMSD and the desegregation plan Monitoring Committee established by this Court, specific student achievement goals will be established. These goals should be similar to, but more specific than, those expressed in rebuttal testimony by Dr. Daniel Levine (reaching national norms on the elementary level in the area of reading in four years and improving the passing rate on the BEST test on the secondary level to a 95% pass rate). These accountability standards should include a time line showing how the KCMSD will progressively move toward achievement of the overall goals. Continued funding, both overall and of specific programs, will depend upon the school's successful efforts at making reasonable progress toward achieving the overall goals, as well as the incremental steps toward those goals.

Improvement in student achievement to remedy the ills of segregation will take disciplined efforts. It will require schools with genuinely high standards and expectations, parents who support and encourage their children to fulfill their potential, and a school district in which teachers are considered valuable professionals. With these resources, and the commitment of the district, improvement can and will be made.

*Magnet Schools*

■ Magnet schools can be utilized to assist the State of Missouri and the KCMSD in expanding desegregative educational experiences for its students (testimony of Dr. Daniel Levine at pp. 22,214, testimony of Dr. Eugene Eubanks at 22,-445, testimony of Dr. Gary Orfield, testimony of Dr. Willis Hawley). However, to be a valuable and effective technique for increasing student desegregation, the themes for the magnet schools must be carefully chosen and based upon a survey of the target enrollment population. There must also be extensive planning concerning the implementation of the magnet programs (testimony of Dr. Susan Uchitelle, and Dr. Gary Orfield).

KCMSD currently operates one magnet secondary school (Lincoln Academy) and two magnet elementary complexes (Southwest Cluster and Swinney-Volker). Reduced levels of federal funding under the Emergency School Aid Act (ESAA) has meant that the KCMSD has not been able to provide the level of funding which these magnet schools originally received, and as such, these programs have not realized their full potential in drawing non-minority enrollment (testimony of Paul Holmes, KCMSD Exh. K–79).

Therefore, the KCMSD is ordered to submit a budget by October 15, 1985, to the Monitoring Committee for the existing magnet schools of Lincoln, Swinney-Volker and Southwest Cluster. This budget shall be both comprehensive and detailed and shall be limited to budget items which are directly related to enhancing the full desegregative drawing power of these schools. Furthermore, KCMSD shall conduct extensive surveys within the KCMSD and throughout the Kansas City, Missouri metropolitan area in order to determine what magnet themes appear to be most

likely to attract non-minority enrollment. This survey shall be completed by January 15, 1986, and a report filed with the Monitoring Committee, accompanied by a proposed marketing and recruitment plan. The marketing and recruitment plan shall include a budget. The State of Missouri shall pay for all costs in conducting the area wide survey and presentation of the report incurred by KCMSD, with such costs not to exceed $60,000. The KCMSD shall also submit to the Committee on or before April 15, 1986, its plan for implementation of additional magnet programs within KCMSD, including a detailed budget. Total costs for preparation of this report shall not exceed $25,000 and shall be paid for by the State of Missouri.

### Staff Development

Staff development is an essential element in any attempt to improve student achievement as a part of a desegregation plan (testimony of Willis D. Hawley). The KCMSD Plan calls for extensive staff development (KCMSD Plan p. 36–38). The District's Plan would provide training to administrative personnel and teachers on the principles and goals of a desegregation plan, the implementation of effective instructional programs, effective methods for transmitting information to parents and community about desegregation, methods of enforcing a fair, equitable discipline program in a desegregated setting, and methods of dealing with transportation problems as well as familiarity with available community and school resources and a knowledge of applicable federal and state laws. Most of the training described in the KCMSD Plan is aimed at assisting in the desegregation of KCMSD and not aimed directly at the quality education components of this plan.

The State Plan incorporates staff development as a part of the individual components, such as the instructional management system component. It relies upon a train-the-trainer approach in which selected key personnel in each school would be provided extra training and those individuals would go back to that school and provide training to the remaining teachers.

KCMSD is ordered to establish a staff development program. This program will be developed in conjunction with the public relations programs to be implemented by the District. The desegregation public relations program, which is aimed at informing and soliciting the support of community members, shall use the KCMSD staff in spreading the word throughout the community about the desegregation plan.

In addition, following decisions made by the school advisory committees and the school board as to the expenditures of funds in the effort to improve student achievement throughout the district, specific training needs of the individual teachers and principals shall be determined and a staff development program planned and implemented. Stipends for after school, weekend and summer staff development sessions, shall be available only when it is impossible to conduct the training and development within the normal work schedule. A fund of $500,000 shall be provided to the KCMSD by the State of Missouri for the payment of stipends.

### Mandatory Student Reassignment

In 1977 the KCMSD implemented a desegregation plan developed by approximately 65 community members chosen to represent parents, students, teachers and various Kansas City groups and organizations (testimony of Sue Fulson). A number of alternative proposals were submitted to the KCMSD School Board and the version eventually approved was designated "6C" (testimony of Dr. Paul Holmes, Sue Fulson). The goal of Plan 6C was to have a minimum of 30% minority enrollment, with the exception of kindergarten classes, in every KCMSD school. Prior to implementation of this plan the enrollment in KCMSD was 65.6% minority students. Twenty of the district's schools were from 30 to 80% minority, 25 were less than 30% minority, and 41 were more than 80% minority (KCMSD Exh. K–2). Following the implementation of Plan 6C, boundary lines

were changed, elementary schools were paired and clustered, enlarged secondary attendance zones were created, allowing two-way reassignment of students, noncontiguous zoning was implemented, and as a result, more than 16,000 KCMSD students had their school assignments changed (testimony of Dr. Paul Holmes, KCMSD Exh. K–70–74, 76). Following Plan 6C implementation, no KCMSD school enrolled less than 30% minority students in grades 1 through 12. Enrollment since that time has decreased by almost 30%, while white enrollment has decreased by more than 44% (KCMSD Exh. K–2). In 1979–80 the United States Office of Civil Rights classified KCMSD as being "in compliance" with federal requirements for school desegregation under Title VI of the Civil Rights Act of 1964 (testimony of Ward). The 1984–85 assignment patterns are the same assignment patterns which were approved by the Office of Civil Rights in 1978 except for adjustments made due to school closings (testimony of Paul Holmes). The KCMSD enrollment for 1984/85 was 36,259 total students with 68.3% of them being Black, 26.7% being non-minority, 3.7% Hispanic, and 1.3% other minority groups (KCMSD Exh. K–74).

The KCMSD proposes to continue the existing student assignment plan, with appropriate modifications for any school closings (KCMSD Plan pp. 2–5). This proposal would require that any modifications for school closings be conducted so that the highest level of desegregation feasible will be achieved and so that each school in the KCMSD will achieve an enrollment of no less than 30% minority for grades 1 through 12. Furthermore, KCMSD's plan would continue to restrict transfers which inhibit desegregation and permit voluntary transfers of students from schools in which they are in the racial majority to a school in which they would be in the racial minority (KCMSD Plan p. 6).

The State Plan proposes to "reduce the percentage of black students in schools where they represent a disproportionate share of the students (compared to the enrollment of the District as a whole)...."

(State Plan pp. 9–13). The State estimates that in order to achieve this goal and obtain an enrollment more proportionate to the district's percentages as a whole, approximately 4,270 students would need to be transferred at a cost in excess of $5,000,-000. Initially, however, the State proposes to conduct computer simulations in order to determine the feasibility of additional transfers to achieve a more proportionate enrollment in each school in the district (testimony of Dr. Terry Stewart). In conducting this study the State proposes to take into account all practical limits on actually achieving greater intradistrict racial integration. These limits include the importance of a student attending a school as near his home as possible, the important role that parent and student choice can play in making any reassignment plan work, and any other potential barrier to an effective reassignment plan (testimony of Dr. Terry Stewart, State Plan at p. 9).

Nineteen of the 50 elementary schools in the KCMSD presently have an enrollment of 90% or more black students. The enrollment in three of the eight junior high schools in the KCMSD is presently 90% or more black. Three of the eight senior high schools have enrollments which are 90% or more black (excluding Lincoln Academy South and North). (KCMSD Exh. K–74).

The KCMSD and the plaintiffs oppose any further mandatory student reassignment at this time. KCMSD's witnesses expressed the opinion that generally mandatory student reassignment would result in further white withdrawal from the school district and specifically that, if the State's plan was implemented, it could result in moving more blacks into racial isolation (testimony of Dr. Daniel Levine at 22,224, testimony of Dr. Eugene Eubanks at 22,447, testimony of Dr. Paul Holmes). In regard to the State plan, Dr. Holmes testified that if racial isolation is defined as a school with 50% or more minority, then in attempting to achieve student body ratios in each school which are proportionate to the district wide ratios, the State's Plan could result in moving a black student from

a less racially isolated environment to one which is much more racially isolated. In addition to Dr. Eubanks and Dr. Levine, there was extensive testimony provided by other witnesses that implementation of any further mandatory student reassignment would result in what is known as "white flight." (the withdrawal of white student enrollment to private schools or the exodus of white families to the suburbs). (testimony of Sue Fulson, testimony of Dr. Gary Orfield, testimony of Dr. Willis D. Hawley).

White flight is no excuse for school officials to avoid the implementation of a reasonable desegregation plan. *Monroe v. Board of Commissioners*, 391 U.S. 450, 459, 88 S.Ct. 1700, 1704, 20 L.Ed.2d 733 (1968). Further, concern over white flight cannot justify any decision to do less than what is necessary to secure the constitutional rights of the students of the KCMSD. *Wright v. Council of the City of Emporia*, 407 U.S. 451, 456–57, 92 S.Ct. 2196, 2200–01, 33 L.Ed.2d 51 (1972). Therefore, while white flight may be "cause for deep concern," it cannot be accepted for achieving anything less than the "complete uprooting of the dual public school system." *United States v. Scotland Neck City Board of Education*, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1972).

However, "[t]he constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." *Swann v. Charlotte Mecklenburg Board of Education*, 402 U.S. at 24, 91 S.Ct. at 1280. Nor is the existence of a small number of one-race or virtually one-race schools within a school district "in and of itself the mark of a system that still practices segregation." *Id.* at 26, 91 S.Ct. at 1281. "The criterion for determining the validity of provisions in a desegregation plan is whether they are reasonably related to the ultimate objective." *Tasby v. Wright*, 713 F.2d 90, 97 (5th Cir.1983). Therefore, "[w]hile the fear of white flight cannot be accepted as a reason for not acting [cita-

tions omitted] the Court may elect a constitutionally permissible plan calculated to minimize white boycotts." *Id.* at 99. That is why the concern over white flight may be taken into account "when it is not advanced to thwart mandatory desegregation (or to perpetuate segregation), but rather to promote a wider integration." *Parent Association of Andrew Jackson High School v. Ambach*, 598 F.2d 705, 720 (2d Cir.1979). In fact, situations in which the United States Supreme Court has rejected use of white flight as a factor in determining or limiting a desegregation remedy were all cases in which a school board had invoked white flight in order to avoid real integration. *Monroe v. Board of Commissioners, supra* 391 U.S. at 450, 88 S.Ct. at 1700; *Wright v. Council of the City of Emporia, supra* 407 U.S. at 451, 92 S.Ct. at 2196; *United States v. Scotland Neck City Board of Education, supra* 407 U.S. at 484, 92 S.Ct. at 2214. Thus, while the concern over white flight cannot be accepted as a reason for achieving anything less than the "complete uprooting of the dual public school system," *United States v. Scotland Neck City Board of Education, supra* at 491, 92 S.Ct. at 2218, the failure to include remedial measures to prevent such flight could itself be a reason why a desegregation plan could achieve something less than "complete uprooting." *See,* Paul Gewirtz, *Remedies and Resistance,* 92 Yale Law Journal 585, 642 (1983). Recognizing the impact white flight can have on the effectiveness of a remedial plan is nothing more than recognizing that there is a difference between "catering to bias" and seeking to minimize patron resistance. *United States v. Board of Education,* 554 F.Supp. 912, 924–25 (N.D.Ill. 1983). This difference has been recognized by the Eighth Circuit in *Clark v. Board of Education,* 705 F.2d 265, 269–72 (8th Cir. 1983) (in order to prevent white flight and stabilize the integration process in a system that was 65% black a district court may reduce the black population in some integrated schools and thereby maintain a number of all black schools); and in *Adams v. United States,* 620 F.2d 1277, 1291–97

(8th Cir.) (to prevent white flight in a school system with 75% black enrollment, a desegregation plan need not reassign additional black children to schools with at least 30% black enrollment even though all-black schools remain), *cert. denied,* 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980), *on remand sub nom., Liddell v. Board of Education,* 491 F.Supp. 351, 356 (E.D.Mo. 1980) (adopting plan), *aff'd* 667 F.2d 643 (8th Cir.), *cert. denied,* 454 U.S. 1081, 102 S.Ct. 656, 70 L.Ed.2d 629 (1981).

■ "Having once found a violation, the district judge or school authority should make every effort to achieve the greatest possible degree of desegregation, taking into account the practicalities of the situation." *Davis v. Board of School Commissioners, supra* 402 U.S. at 37, 91 S.Ct. at 1292. Therefore, it is incumbent upon this Court to further explore any reasonable potential for achieving further desegregation. As such, the State's proposal for further study, modified in its goal, must proceed. In proceeding the study should revise its goal. Instead of seeking to reassign students in order to achieve the same ratio of minority students to non-minority students in each school that exists in the enrollment of the district as a whole, the study should seek to determine the feasibility of further reductions in the percentage of black students in the 25 schools where the enrollment remains 90% or more black, while recognizing the need for students to attend schools as close to home as possible. Total cost for this study should not exceed $175,000 and it shall be completed by the end of the 1985/86 school year. KCMSD's Plan 6C shall remain in full force and effect with any modification of the Plan being implemented only after review by the Monitoring Committee and approval by the Court.

The evidence is clear, further mandatory student reassignment at this time will only serve to increase the instability of the KCMSD and reduce the potential for desegregation. Unless and until this or other studies show that further mandatory student reassignment can achieve additional desegregation without destabilizing the desegregation which presently exists, then realization of further desegregation of the district must depend upon other components of this plan.

### *Volunteer Interdistrict Transfers*

■ To accomplish desegregation within the boundary lines of a school district whose enrollment remains 68.3% black is a difficult task. As this Court stated in its January 25, 1985 order, "because of restrictions on this Court's remedial powers in restructuring the operations of local and state government entities," any *mandatory* plan which would go beyond the boundary lines of KCMSD goes far beyond the nature and extent of the constitutional violation this Court found existed. However, there are avenues available to the State of Missouri and the KCMSD which present the opportunity for increasing the desegregative educational experiences of the students within the Kansas City metropolitan area.

Achievement of AAA status, improvement of the quality of education being offered at the KCMSD schools, magnet schools, as well as other components of this desegregation plan can serve to maintain and hopefully attract non-minority student enrollment. In addition, voluntary interdistrict transfers may serve to provide additional opportunities for desegregated schools as well as desegregative educational experiences for KCMSD students. Such plans have received encouragement from the Eighth Circuit in similar situations, *Liddell VII,* 731 F.2d 1294 (8th Cir.1984) (en banc), *cert. denied,* 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984). In St. Louis voluntary interdistrict transfers have resulted in increased desegregation (testimony of Dr. Susan Uchitelle).

Therefore, the State of Missouri shall actively seek the cooperation of each school district in the Kansas City, Missouri metropolitan area in a voluntary interdistrict transfer program. On or before the end of the 1985/86 school year the State of Missouri shall report to the Monitoring Com-

mittee listing the suburban districts which have agreed to participate, stating how many students each district has agreed to accept as well as the number of students which would transfer to the KCMSD. KCMSD shall also report to the Monitoring Committee the number of its students which would transfer to a suburban district. If any of the suburban districts volunteer to participate in inter-district transfers, the program shall begin with the 1986/87 school year.

The State will be required to pay for the transportation and tuition costs of any KCMSD black student who wishes to transfer from a school within KCMSD in which their race is in the majority, (with preferences for students from schools with enrollments of 90% or more black students), to a school where space is available in another school district in the Kansas City metropolitan area in which their race is in the minority. In addition, the State shall pay for all transportation costs and the foundation allotment for non-minority students living in other school districts, who transfer to schools in the KCMSD, having a minority enrollment of 50% or more. Furthermore, the State shall continue to pay to the KCMSD the full student foundation allotment for each student who transfers from the KCMSD to a suburban school district and to each suburban school district for each student who transfers from a suburban district to KCMSD. The receiving district will agree not to reject individual applicants unless there is a history of serious disciplinary problems, will allow the transfer student to remain in attendance until such student graduates or returns to the student's home district, as long as that student satisfies all academic and other standards applicable to all resident students, will treat interdistrict transfer students in the same manner, in all regards, as they treat resident students, and will permit KCMSD to recruit applicants for interdistrict transfers within its district. Any additional agreements between KCMSD and any participating metropolitan area school district shall be presented to the Monitoring Committee for review and ac-

tion. Furthermore, the State of Missouri will be required to provide a full-time counselor for every 100 students who transfer from KCMSD to a Kansas City, Missouri area metropolitan school district. This counselor shall be in the employment of KCMSD and shall spend a proportionate amount of time at the suburban schools in which the KCMSD transfer students are enrolled.

Finally, upon submission of its report to the Monitoring Committee concerning the willingness of other school districts to participate in such a voluntary program, the State shall include an estimated budget for the potential transfers.

### Capital Improvements

KCMSD is currently utilizing 50 elementary school buildings, 9 junior high buildings, and 9 senior high school buildings (testimony of E. Allen Roth). The average age of the 68 school buildings utilized by the KCMSD is 58 years (testimony of E. Allen Roth).

The current condition of the 68 school facilities adversely affects the learning environment and serves to discourage parents who might otherwise enroll their children in the KCMSD (testimony of Dr. Levine, Dr. Eubanks, Sue Fulson, E. Allen Roth). The deterioration of the facilities is due to a deferred maintenance program which has extended over the past 10 to 15 years (testimony of E. Allen Roth). The deferred maintenance is a result of KCMSD's lack of financial resources as evidenced by its inability to pass a capital improvements bond issue, although several attempts have been made since 1965 (testimony of Carl Struby).

The deteriorating conditions of the facilities include safety and health hazards, educational environment impairments, functional impairments, and appearance impairments (testimony of E. Allen Roth, KCMSD Exhibit K–81, Devine James Study). The problems include extremes of heat and cold due to faulty heating systems, peeling paint, broken windows, odors resulting

from inadequate and deteriorating ventilation systems, improper lighting, wiring problems, inadequate storage, lack of appropriate space for library and resource rooms, crumbling playground equipment installed over hard surfaces, water damage due to roof leakage, and deterioration of steps in school access areas (KCMSD Exhibit K–87, 67 slides of schools).

The improvement of school facilities is an important factor in the overall success of this desegregation plan. Specifically, a school facility which presents safety and health hazards to its students and faculty serves both as an obstacle to education as well as to maintaining and attracting non-minority enrollment. Further, conditions which impede the creation of a good learning climate, such as heating deficiencies and leaking roofs, reduce the effectiveness of the quality education components contained in this plan.

During fiscal year 1985, under a Missouri statute permitting the organization of a not-for-profit corporation which would issue bonds for capital improvements to school buildings, the KCMSD raised $10,000,000 to permit correction of some of the more extreme problems within the school building facilities presently being used. Under that statute KCMSD makes rental payments to the not-for-profit corporation, which has been granted title to these buildings, out of its operating budget in the amount of approximately $1,300,000 annually. These funds are utilized to pay the bond obligations (testimony of Carl Struby).

At the request of the KCMSD, E. Allen Roth, a licensed architect, examined 19 of the 68 school buildings and for four of the school buildings prepared a detailed cost estimate and specifications for correcting facility deficiencies. Based upon these visits, the 1980 Devine James study, and taking of bids for the partial work, Mr. Roth concluded that total costs for building rehabilitation in the KCMSD, to return the buildings to a point where they could be safe and appropriate for educational programs, would be between $55,000,000 and $70,000,000. Mr. Roth further estimated that the work could be completed within a three to four year time period (testimony of E. Allen Roth).

The State (State Plan p. 111) proposes a $20,000,000 facilities improvement program with the state making a one time contribution not to exceed $10,000,000. The purpose of this facility improvement program would be to promote and encourage the KCMSD to "strive for excellence in the care, maintenance, and upkeep of its facilities." (State Plan at p. 11). The State indicated that first priority should be given to those schools in which the student population was 90% or more black. These funds would be to correct safety hazards at the most severe level of inadequacies. The State argues against the adoption of a more comprehensive facility improvement program as a part of the desegregation plan for four reasons. First, the present condition of the facilities, according to the State, is not traceable to the unlawful segregation found to have existed by this Court. Second, the present condition of facilities is due to the lack of maintenance on the part of the KCMSD and its failure to appropriate adequate funds to correct these problems. Third, the improvements are not necessary in order to carry out the quality education components of the desegregation plan (testimony of Carla Santorno). Finally, the State contends that the $55,000,000 to $70,000,000 estimates made by the KCMSD and its architect E. Allen Roth, are excessive and that $20,000,000 would be sufficient to cover the health and safety problems which exist in the school district.

■ The State does not dispute that there are serious structural and environmental problems throughout the facilities utilized by the KCMSD. The State's argument that the present condition of the facilities is not traceable to unlawful segregation is irrelevant. *Tasby v. Wright, supra* at 97; *Haycraft v. Board of Education,* 585 F.2d 803, 805 (6th Cir.1978); *Clark v. Board of Educ. of Little Rock School District,* 465 F.2d 1044 (8th Cir.1972). Fur-

ther, the State's argument that the present problems are due to a lack of maintenance on the part of the KCMSD is simply further evidence of the detrimental effects that segregation has had on this school district's ability to raise adequate resources. The State's argument that the facility improvements are not necessary in order to carry out the educational components of a desegregation plan fails to address this Court's responsibility in remedying the vestiges of segregation or in implementing a desegregation plan which will maintain and attract non-minority enrollment.

 The Court finds that in order for other components of this plan to be effective, it is imperative that improvements be made in the KCMSD's facilities. In arriving at an equitable apportionment for the cost of facility improvements, the Court takes into consideration that KCMSD has spent somewhere between $15,000,000 and $18,000,000 in the implementation of Plan 6C for which it was not reimbursed and for the 1986 fiscal year has budgeted approximately $17,000,000 for desegregation programs which are not covered in this plan. KCMSD has available the sum of $10,000,000 for captial improvements. The Court is of the opinion that the State should match this figure plus an additional $17,000,000 for immediate facility improvements. It will not be possible nor prudent to attempt to make all necessary facility improvements simultaneously. Therefore, as soon as possible, the KCMSD shall submit a $37,000,000 capital improvements plan developed by architects and engineers to the Monitoring Committee to be implemented as expeditiously as possible under a cost effective improvement program. After capital improvements have been made, it will be incumbent upon KCMSD to include in its budget funds for the maintenance of the improved facilities.

These initial improvements shall focus on the following three priorities: (1) eliminating safety and health hazards; (2) correcting those conditions existing in the KCMSD school facilities which impede the level of comfort needed for the creation of a good learning climate; and (3) improving the facilities to make them visually attractive. After the submission of the $37,000,000 improvement plan, KCMSD shall then review other capital improvements needed in order to bring its facilities to a point comparable with the facilities in neighboring suburban school districts. At this time the Court reserves judgment as to whether the State will be required to make any additional expenditures for capital improvements beyond the $37,000,000 set forth above.

### Plan Administration

 The success of this desegregation plan depends upon the KCMSD's ability to integrate this plan's components into ongoing district activities. Some administrative expenses are built into the component's budget, such as early childhood development, effective schools, voluntary interdistrict transfers, magnet schools and summer school. Some components will generate little, if any, administrative overhead, such as before and after school tutoring.

The Court, however, will order the KCMSD to hire an additional public information specialist at a total cost of $25,000 with supplies and related expenses of $5,000, for a maximum expenditure of $30,000. This individual shall be responsible for developing and implementing a public information program regarding the KCMSD desegregation plan. The main focus of the public information effort shall be to solicit community support and involvement in the plan. Costs will be paid by the State of Missouri.

Beyond the public information program and the administrative expenditures built into the individual desegregation plan components, the KCMSD shall provide for administration of this plan with existing administrative personnel.

### Monitoring Committee

 Monitoring of the desegregation plan is an essential function to the success of the plan (testimony of Dr. Daniel Levine, Sue Fulson, Dr. Willis D. Hawley). The

monitoring function is one which should be conducted by individuals or organizations independent of the parties involved, to enable the Court to have an objective assessment of the progress and problems encountered in implementing the desegregation plan.

There shall be a Monitoring Committee to oversee the implementation of this plan. The Committee shall be composed of ten individual members, four of whom shall be Black, four White and two Hispanic. It shall be organized as follows: A Budget Committee with three members, one of whom shall be the chairperson; a Desegregation Committee with three members, one of whom shall be the chairperson; an Education Committee with three members, one of whom shall be the chairperson; a general chairperson of the ten member committee who shall be an ex officio member of each of the three subcommittees; and an Executive Committee comprised of the general chairperson and the chairpersons of each of the three subcommittees.

The overall Monitoring Committee shall have the responsibility for conducting evaluations and collecting information and making recommendations for any modifications concerning the implementation of the plan.

At the outset, the Executive Committee should set out with specificity the areas of responsibility of each of the other three subcommittees. The Executive Committee shall have the responsibility of making all reports to the Court concerning progress or problems in the implementation of the plan. Each person on the Executive Committee shall have one vote. If however the Executive Committee is evenly divided on any issue, the general chairperson shall have the tie breaking vote. All decisions or recommendations of the Budget, Desegregation and Education Committees shall be referred to the Executive Committee for final review and action. Every attempt should be made by all members of the overall committee and each member of the subcommittees to reach an agreement on

all issues and recommendations which will avoid bringing matters before this Court.

The members of the overall Monitoring Committee shall be selected by the Court. The State of Missouri, KCMSD and the American Federation of Teachers Local 691 (AFT 691) shall each submit the names of nine nominees for appointment to the Committees—three each for the Budget Committee, the Desegregation Committee and the Education Committee. One nominee submitted by each party will be appointed by the Court to serve on the committee for which the nominee was named. The plaintiffs shall submit the names of three nominees, one of whom will be appointed by the Court as the general chairperson of the Monitoring Committee. The nominees shall be submitted to the Court on or before Monday, July 15, 1985. Each nominee shall be prepared to attend a hearing to be held August 1, 1985 commencing at 10:00 a.m. The criteria this Court will use in selecting the general chairperson will include, among other things, the individual's independence from the parties in this case, the individual's commitment to the implementation of the desegregation plan, the ability of the individual to spend the required amount of time in directing the committee's overall activities, and the individual's background as it relates to community involvement, education and other related matters. The general chairperson's role will be a pivotal one. The responsibilities will include insuring that the subcommittees are carrying out their functions in a responsible and efficient manner, that the Court is properly informed in a timely manner concerning problems and recommendations in regard to the desegregation plan and attempting to assist all parties involved in reconciling differences that might arise among themselves rather than presenting disputes for resolution by this Court.

Nominees submitted for each of the committees shall have experience and expertise in the areas of general responsibility of the committee for which they are nominated, they should be independent from any of the parties involved in the case, they should be committed to the successful implementa-

tion of the plan and have the ability to spend the time required to respond to the obligations of the committee.

Each member of the overall Monitoring Committee shall be appointed to serve a two year term. Any member of the Committee whose continued service is not in the best interests of the function of the committee may be removed by the Court for cause. Any vacancies shall be filled by the Court in the same manner in which the original appointment was made.

The Committee shall report to the Court at such times as it feels necessary concerning problems involved in the implementation of the plan except that it shall make an annual report on or before the first day of July of each year. The Committee shall have authority to make such investigations as it deems necessary in fulfilling its responsibilities for the monitoring of the plan.

To aid the Monitoring Committee in carrying out its function, the Court establishes a monitoring office composed of an executive secretary with appropriate professional training and experience to be appointed by the Executive Committee of the general Monitoring Committee, along with a clerical employee with an annual budget of $142,200, the cost of which shall be borne solely by the State. The budget shall be composed of the annual salary for the executive secretary, including fringe benefits, not to exceed $50,000; the clerical employee's maximum salary, including fringe benefits, of $20,000; and there shall be $20,000 for equipment, supplies and other expenses for operation of the monitoring office. Office space for the monitoring office shall be furnished free of charge by KCMSD.

There shall be $52,200 made available for per diem payments to members of the Mon-

itoring Committee. The general chairperson shall be paid $60 per hour for up to a maximum of 120 hours annually as per diem for that individual's efforts on behalf of the committee. The other committee members shall receive $50 per hour for up to a maximum of 100 hours per year as per diem for their efforts on behalf of the committee. Expenses incurred by members of the committee shall be paid out of the $20,000 budgeted for equipment, supplies and other expenses.

### Financing Summary

In its September 17, 1984 order this Court stated that "much of the costs for preparing and implementing a plan to dismantle the vestiges of a dual school system in the KCMSD should be borne by the State." *Jenkins v. State of Missouri,* 593 F.Supp. 1485, 1506 (W.D.Mo.1984). This determination was based upon the Court's earlier finding that the State had the "primary responsibility for insuring that the public education systems in the State comport with the United States Constitution." *Id.* at 1506. However, as a defendant found to be liable, KCMSD should pay for part of the costs involved in the implementation of this Plan.

The KCMSD has spent considerable funds on programs supporting desegregation within the district. (*See,* KCMSD Exh. K–80, K–95, K–78, K–78A). In the upcoming year KCMSD has budgeted between $15,000,000 and $17,000,000 for programs directly or indirectly related to desegregation and has provided approximately $15,-000,000 to $18,000,000 in funding for implementation of desegregation Plan 6C since 1977.

The State of Missouri shall bear the estimated costs involved for a period of three years in the following components:

| | 1st Year | 2nd Year | 3rd Year | TOTAL |
|---|---|---|---|---|
| Improved Student Achievement | 4,025,000 | 5,725,000 | 7,425,000 | 17,175,000 |
| Voluntary Inter-District Transfers | open | open | open | open |
| Magnet Schools | 85,000 | open | open | 85,000 (open) |
| Student Reassignment | 175,000 | open | open | 175,000 (open) |

| | 1st Year | 2nd Year | 3rd Year | TOTAL |
|---|---|---|---|---|
| Reducing Class Size | 2,000,000 | 4,000,000 | 6,000,000 | 12,000,000 |
| Administrative Costs | 30,000 | 30,000 | 30,000 | 90,000 |
| Staff Development | 500,000 | -0- | -0- | 500,000 |
| Summer School | 222,500 | 454,500 | 454,500 | 1,131,500 |
| AAA Status | 2,369,250 | 1,419,250 | 1,419,250 | 5,207,750 |
| All Day Kindergarten | 546,000 | 546,000 | 546,000 | 1,638,000 |
| Before and After School Tutoring | 104,400 | 104,400 | 104,400 | 313,200 |
| Early Childhood Development | 616,674 | 616,674 | 616,674 | 1,850,022 |
| Monitoring Office and Committee | 142,200 | 142,200 | 142,200 | 426,600 |
| Capital Improvements | 27,000,000 | open | open | 27,000,000 (open) |
| TOTAL | $37,816,024 | $13,038,024 | $16,738,024 | $67,592,072 |

The KCMSD shall bear the estimated costs in the following components, many of which will be for a minimum of three years:

| | 1st Year | 2nd Year | 3rd Year | TOTAL |
|---|---|---|---|---|
| Summer School | 222,500 | 454,500 | 454,500 | 1,131,500 |
| AAA Status | 2,369,250 | 1,419,250 | 1,419,250 | 5,207,750 |
| All day Kindergarten | 546,000 | 546,000 | 546,000 | 1,638,000 |
| Before and After School Tutoring | 104,400 | 104,400 | 104,400 | 313,200 |
| Early Childhood Development | 616,674 | 616,674 | 616,674 | 1,850,022 |
| Capital Improvements | 10,000,000 | open | open | 10,000,000 (open) |
| TOTAL | $13,858,824 | $ 3,140,824 | $ 3,140,824 | $20,140,472 |

The current operating levy for the KCMSD is $3.75 (State Exh. 18, testimony of Carl Struby). However, the $3.75 levy when, adjusted under § 164.013 of the Mo. Rev.Stat. (the proposition C rollback), results in the KCMSD having an operating levy of $3.26 (testimony of Carl Struby, KCMSD Exh. K–97). The $3.26 actual operating levy will be further reduced as a result of the state-wide reassessment (§ 137.073 Mo.Rev.Stat., testimony of Carl Struby). The uncontradicted testimony of KCMSD Board of Education treasurer Carl Struby is that the budget for the upcoming school year is presently $3,000,000 short of revenue and the only unallocated funds are an $850,000 to $1,000,000 contingency fund. Therefore, the KCMSD is presently unable to finance its portion of this school desegregation plan.

It is noted that legislation recently signed by the governor will permit the KCMSD to raise its reduced levy up to the pre-assessment level by a simple majority vote. Thus, after reassessment, local revenues will be able to be increased by a majority vote instead of the two-thirds vote which is presently required.

The presentation of a tax levy to the voters prior to the upcoming school year would be impossible because of the time constraints under which the school district is operating. Furthermore, it is extremely unlikely that such a proposal would receive the two-thirds majority presently required (testimony of Carl Struby, testimony of Sue Fulson).

The Eighth Circuit in the St. Louis desegregation plan recognized that "the district court's equitable power includes the remedial power to order tax increases or the issuance of bonds...." *Liddell VII* at 1322. Further, the Eighth Circuit upheld the district court's increase of a tax levy

when there was "no reasonable probability that such a tax levy would be approved by the required two-thirds vote in the aftermath of a desegregation order." *United States v. Missouri*, 363 F.Supp. 739 (E.D. Mo.1973), *aff'd*, 515 F.2d 1365, 1372 (8th Cir.), *cert. denied*, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975). *See also, Griffin v. School Board*, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964) (where the Supreme Court upheld a district court's order that the supervisors exercise their power to levy taxes to raise funds adequate to reopen, operate and maintain without racial discrimination a public school system).

While this Court has the necessary authority to order a tax increase to finance that portion of the desegregation plan for which the KCMSD has responsibility, this Court hesitates to take such action. When a Court considers the possibility of imposing a tax rate as an aspect of its desegregation decree, "there occurs a tension between two venerable maxims of the American tradition: 'Taxation without representation is tyranny' becomes the banner of some of those who are to be taxed, while the district court, safeguarding the effective implementation of its order, is deeply cognizant of the venerable phrase that "the power to tax involves the power to destroy." *McCullough v. Maryland*, 17 U.S. (4 Wheat), 316, 427, 4 L.Ed. 579 (1819); *Evans v. Buchanan*, 582 F.2d 750, 777 (3d Cir.1978), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980).

 However, because the present financial resources of the KCMSD makes it impossible for it to appropriate funds necessary to implement the school desegregation order of this Court, and because of the extreme unlikelihood, due to the recent history of tax levy defeats and time constraints, that a tax levy proposal would be received favorably by two-thirds of the voting patrons of the KCMSD, it is hereby ordered that the tax levy rollback required by § 164.013 Mo.Rev.Stat., (the Proposition C rollback) shall be enjoined to the extent necessary to raise an additional $4,000,000

for the coming fiscal year. This one year procedure was utilized by the federal district court in the Eastern District of Missouri in *Liddell v. State of Missouri*, 567 F.Supp. 1037, 1056 (1983), and upheld by the Eighth Circuit Court of Appeals in *Liddell v. State of Missouri*, 731 F.2d 1294 (8th Cir.) (en banc), *cert. denied*, 469 U.S. 816, 105 S.Ct. 82, 83 L.Ed.2d 30 (1984) (*Liddell VII*).

This rollback will be in effect for one year only. It will provide the KCMSD with an opportunity to present a tax levy proposal to its patrons at the next regularly scheduled school election. Therefore, it is ordered that the KCMSD shall submit a tax levy increase proposal to its patrons at the next regularly scheduled school election which, if approved, will provide funds sufficient to pay for its cost of the desegregation plan as previously outlined.

The implementation of a school desegregation plan must deal with constitutional law, state and local politics, educational theory and social relations, and do so all at the same time. Thus a school desegregation plan is more than a legal principle implemented through this Court within the KCMSD, but a process which requires the cooperation of all parties, and general acceptance by KCMSD patrons as well as the citizens of the State of Missouri, in order to be truly successful. The plan adopted by this Court represents an effort to give meaning to the constitutional mandate expressed by the Supreme Court thirty years ago, while seeking to be effective in the real world. The plan seeks to be supportive of those high principles which separate our society from those which lack a commitment to human dignity. But the success of this plan rests in others' hands, for to have a society where equal justice under the law is a "living truth" requires commitment of more than this nation's courts, but of the citizenry which those courts serve.

While jurisdiction is retained by this Court for certain matters as set forth in the foregoing order, the Court considers this order together with previous orders entered by this Court to be a final appeal-

able judgment in this case. The Clerk is therefore directed to remove this case from the Court's docket.

## ON PENDING MOTIONS

Several motions are pending in this case including KCMSD's motion to amend the budget for the full-day kindergarten program, KCMSD's motion for an order permitting personnel hired for the desegregation programs to be paid according to salary schedule, KCMSD's motion for adjustment of the 1986/87 desegregation plan budget, KCMSD's motion for approval of the 1986/87 magnet programs. In addition, plaintiffs filed a motion seeking to clarify whether Kansas suburban schools are a part of the voluntary interdistrict transfer program. Intervenor AFT Local 691 filed a motion for an order for additional funds to finance the desegregation plan. The motions will be granted in part and denied in part as outlined below in the following order.

### Public Information

This Court allocated $30,000 to allow KCMSD to hire an additional public information specialist whose responsibility was to develop and implement a public information program regarding the KCMSD desegregation plan. The main focus of that public information effort was to solicit community support and involvement in the plan. There is little evidence that the District has fulfilled the intended goals of the Court's mandate in this area. Therefore, KCMSD shall develop and submit by August 1, 1986 a plan to the Desegregation Monitoring Committee detailing how the District plans to accomplish the public information goals for 1986/87.

## IMPROVING STUDENT ACHIEVEMENT

### Triple AAA Achievement

The Missouri Department of Elementary and Secondary Education's (DESE) annual evaluation of KCMSD revealed that the District had reached AAA status in all ar-

eas except one. KCMSD needs additional resources to meet the library or "school learning resource center" standards. The original library assessment was not conducted by trained library personnel (Testimony of Casner, p. 91). After KCMSD hired additional professional librarians under the desegregation remedial plan a new evaluation was conducted and presented to DESE for review. The DESE and KCMSD's analysis as to materials needed is identical (Testimony of Casner, p. 93).

Further, a projected increase in student enrollment for school term 1986/87 will require the hiring of one (1) additional librarian in order to continue to meet AAA standards in this area.

Finally, due to the KCMSD's established salary schedule many of the 125 professional staff and 31 teacher aides hired during year one of the desegregation program are eligible for increased compensation. Thus, actual year two costs, incorporating the increase in compensation, for 125 professional staff members and 31 teacher aides will be $3,821,786 (Testimony of Gaunt, p. 170).

The hiring of art, music, physical education and planning time teachers, as well as teachers aides, has brought the District from AA to AAA rating in the areas of teaching load and curriculum. The District now meets AAA standards for pupil personnel services through the hiring of additional counselors. And while additional library staffing may eventually be necessary to improve reading performance at low achieving elementary schools where a high proportion of economically disadvantaged minority students attend, KCMSD is now in compliance with AAA standards for librarians.

KCMSD is ordered to take those steps necessary to reach a AAA rating in all component areas during the spring 1987 DESE evaluation. Only one area lacks AAA rating: library resources. Sufficient funds will be provided to purchase, inventory and distribute the needed books and materials. The State of Missouri shall *not* grant AAA status to KCMSD based upon a

*plan* to acquire the needed resources. A student cannot read a book until it is on the library shelf, or use a globe until it is at the school. Thus, the achievement of AAA ranking will be based upon the District's actual resource inventory.

KCMSD is to budget $8,790,697 in order to become a AAA ranked district by the end of the 1986/87 school term. The State of Missouri will pay a maximum of $4,737,-380 of this total amount, with KCMSD paying the balance of $4,053,317. Any carryover from year one of the desegregation remedial plan will be used to reduce the State's and the KCMSD's contribution in 1986/87. That carryover shall include any unexpended funds from the $950,000 originally allocated for library resources during year one.

For the 125 professionals and 31 teacher aides, the State will pay a maximum of $1,910,893 and KCMSD shall pay an equal amount. For one additional librarian, the State of Missouri and KCMSD shall split the $32,750 maximum cost of salary and fringe benefits equally. The KCMSD will continue to charge the least expensive personnel to the desegregation budget when multiple hirings occur.

For shelving required for the additional library resources, the State of Missouri and KCMSD shall share equally the maximum cost of $90,225. In the area of library resources the State shall pay no more than $2,725,000 and KCMSD shall pay the projected balance of $2,040,936, bringing the projected total to $4,765,936 (including the $950,000 originally allocated in year one budget). The State's amount shall be a one time expenditure. KCMSD's amount, $2,040,936, slightly higher than that amount needed to maintain the AAA library resources on an ongoing basis (Testimony of Casner at p. 95) shall be used annually to insure maintenance of AAA standard library resources in the remaining years of this desegregation plan.

In order to achieve AAA ranking KCMSD will be allowed $80,000 in additional personnel costs on a one time basis in order to purchase, inventory and distribute library resources. KCMSD shall submit a budget for review and recommendation to the Monitoring Committee on or before July 3, 1986 for these funds, which shall be evenly divided between the State of Missouri and KCMSD.

KCMSD shall report to the Monitoring Committee at least every 60 days, beginning not later than August 1, 1986, on their progress towards reaching district-wide AAA ranking. The report shall be detailed and include a specific analysis of progress being made by the District towards the purchase and distribution of the required resources.

The Court is firmly convinced that AAA status can be attained by the next evaluation by the DESE. The KCMSD Board of Education, superintendent, and all administrative personnel must take whatever steps are necessary in order for the District to achieve AAA status before the end of the 1986/87 school term. Such an achievement is the cornerstone in the District's efforts toward improving student achievement. Substantial and sufficient resources area available for laying this cornerstone. When those resources are coupled with a commitment on the part of the Board of Education and administrators to reach this goal, then KCMSD will once again take its place among the AAA rated schools of this state. This Court, through its Monitoring Committee, will closely monitor the progress of the District toward achieving this goal, and looks forward to next spring when the patrons, all parties, and the District can share in the pride of regaining the AAA rating for the first time since 1977.

*Summer School*

The summer school program for the summer of 1986 is presently budgeted at a cost of $909,000, evenly divided between the State of Missouri and KCMSD. KCMSD has requested a budget expansion to $1,434,649 and the removal of caps which were contained in the June 14, 1985 order relating to per student costs. While the per student caps will be removed, the total budget for the summer school program for

the summer of 1986 shall be $996,000. In addition to the operating expenditures of $996,000, the summer school budget shall include a maximum of $200,000 for transportation. These costs will be evenly divided between KCMSD and the State. These figures are based upon projected enrollment at the elementary level of 1,480, 1,200 students at the junior high level and 1,000 students at the senior high level. A modified budget shall be submitted to the Monitoring Committee's Executive Committee as soon as possible but no later than July 3, 1986. Detailed explanations shall be required in regard to the expenditures outlined in the proposed budget for the categories of awards, food, repair and maintenance, tuition and fees, and workshops. Furthermore, a detailed transportation budget shall be presented to the Monitoring Committee for review and recommendation within the same time frame. The enrichment and cooperation program which was approved in the June 14, 1985 order of this Court shall be deleted from that order and the KCMSD will not be required to operate such a program during the summer of 1985.

By January 9, 1987, the District shall report to the Monitoring Committee providing a detailed plan for the 1987 summer school program. This plan shall address the need to have continuity between the regular academic year and the summer school program as well as problem areas which have been identified in the December, 1985 summer school evaluation report and those identified in the next evaluation conducted by the KCMSD evaluation office. The report submitted to the Monitoring Committee shall address the specific recommendations for improving summer school contained in these evaluations, with specific attention being paid to the marketing of a summer school program to parents, improved communications with regular schools regarding the selection of students to attend summer school, reviewing the promotion/retention policy as it relates to summer school, and providing more planning time for teachers.

*Full Day Kindergarten*

The full day kindergarten program is projected to have a student enrollment of 3,482 for the upcoming 1986/87 school term. In addition, federal funds from Chapter I programs which were used during year one of the desegregation plan to pay for 21 full day kindergarten teachers will not be available for that purpose in year two. This is due to federal regulations which govern the Chapter I program. The increase in enrollment and the decrease in federal funding available for full day kindergarten teachers requires that changes be made in the June 14, 1985 order of this Court. In addition, KCMSD's established salary schedule requires that full day kindergarten teachers who taught during year one of the desegregation program, and will remain on staff for year two, are eligible for an increase in compensation.

KCMSD needs 158 kindergarten teachers for its projected enrollment of 3,482 kindergarten students. Prior to the remedial plan KCMSD had 100 non-Chapter I kindergarten teachers. Forty-one additional teachers were hired under year one of the desegregation plan. Thus an additional seventeen kindergarten teachers will be needed for 1986/87 school term. The increase in compensation for year one kindergarten teachers is $26,496 (Testimony of Giles at p. 31). Therefore, the KCMSD shall be allowed a maximum of 58 teachers, in addition to the 100 non-Chapter I kindergarten teachers in place prior to the remedial plan, at an average cost of $28,000. In addition, the District shall be allowed $26,496 to cover an increase in compensation for those teachers hired during year one of the desegregation remedial plan. Since a portion of these funds are being utilized to replace kindergarten teachers who were compensated from Chapter I federal funds, then the District shall report to the Monitoring Committee for review and recommendation, on or before August 1, 1986 concerning how the District plans to expend the Chapter I funds which are freed up by this additional expenditure. The Court will require that Chapter I funds

freed up as a result of this order to be spent in a manner compatible with the desegregation remedial plan.

Finally, the public relations staff member hired as a part of this desegregation remedial plan shall report to the Monitoring Committee on or before August 1, 1986 concerning what strategies the District has in place to inform and recruit students to its full day kindergarten program.

### Before and After School Program

The before and after school program was operated in ten schools in the District. However only one of the ten schools had a before school component. Present funding is at $104,400. KCMSD has requested to expand the program to 20 schools with a budget of $275,433. Because of the plans to incorporate a before and after school component in the magnet school plan and because the District has only implemented a before school component in one of the ten schools, the District's request for expansion will be denied at this time. The before and after school program, as envisioned by this Court, based upon evidence presented during the remedial hearing in May of 1985, is a program which has the opportunity for recruiting non-minority students. It is not exclusively a tutoring program but can serve as a program for before and after school supervision. Therefore, any tutoring which may be a part of this program need not be done by certified instructors but rather can be accomplished, as pointed out in the June 14, 1985 order by cross-age instruction or peer tutoring and parental involvement. Therefore KCMSD shall redesign its before and after school program to expand the before school component to more sites and shall analyze the present sites to determine whether or not they are the best sites for attracting desegregated enrollment. A revised budget, program sites, and a program synopsis shall be provided to the Monitoring Committee for review and recommendation on or before August 1, 1986.

### Early Childhood Development Program

The present budget for the year two early childhood development program is $1,233,348. KCMSD proposes an increase in the budget to $1,551,787 as well as approval for the expansion of the opportunity classrooms in an amount equal to the carryover from the year one budget. The Court will approve the $1,551,786 budget but will require that any carryover from the year one budget be incorporated into that amount. Costs will be shared equally by KCMSD and the State.

The District shall report to the Monitoring Committee for review and recommendation on or before July 3, 1986 on its revised budget for the upcoming school term. Specifically, the District shall provide additional information concerning the following budget category areas: tuition and fees, membership dues, supplies and materials under both the parent education and parent involvement component, contractual services under the opportunity classrooms component, equipment and furniture (since the testimony was that these items had been purchased during year one of the program).

In addition, KCMSD shall provide ongoing reports on the progress of this program to the Monitoring Committee. The District shall provide these reports at least quarterly, beginning August 1, 1986, and the reports shall include, at a minimum, information concerning enrollment, location site, staffing and budget expenditures.

### Effective Schools

The effective schools component of the desegregation remedial plan seeks to foster parental, patron, teacher and field administration staff involvement in the improvement of student achievement. The Court sought that involvement because effective changes in schools comes from the "bottom up" and not from the "top down." The District has requested an increase of $250,-000 in this program component area for four alternative schools. These schools are alternative schools with specialized programs and their enrollment is made up of

549 students from other schools throughout the District. The Court will expand the program to allow an allotment of $75,000 to be divided among these four schools on the basis of student population. In addition, this Court will reduce the overall expenditure for the effective schools program by the amount equal to those funds which were to be received by the seven magnet schools. Therefore, $525,000 will be subtracted from the overall allocation and $75,000 will be added to the balance, coming up with a total of $5,275,000 to be paid entirely by the State of Missouri. KCMSD will provide a budget for these funds to the Monitoring Committee for review and recommendation on or before August 1, 1986.

In order to achieve the goals of this program KCMSD shall not institute any procedures or strategies which would result in normal district level activities being paid for by the effective schools component. Nor shall KCMSD reduce any present district level activities and place the financial burden on individual schools to purchase these services utilizing effective school resources.

One of the critical areas in elementary schools identified in the May, 1985 remedial hearing was that of elementary reading alignment. Several components of this Court's order of June 14, 1985 were intended in part to support a major reading alignment effort. These components included effective schools, reductions in class size, staff development, and summer school. While some progress appears to have been made with respect to elementary reading alignment, the KCMSD's formative report of February, 1986 indicates that implementation problems have been encountered. The report states that some schools were continuing to "teach *all* the objectives in the Houghton Mifflin text, rather than the reduced number," that this decision may have had a negative impact on staff development, that the majority of the reading resource teacher's time was being devoted to curriculum development rather than assistance to schools regarding alignment and that the reading coordinator was hampered by a split assignment. The evaluation indicated that there was confusion surrounding the status of the alignment manual and that this confusion should be resolved as soon as possible.

In view of the importance of elementary reading alignment, an evaluation report will be prepared during September of 1986. The report's purpose will be to determine how well teachers are implementing alignment and identify what problems are being encountered throughout the district. The report shall include identification of critical actions, time schedules, deadlines, resource allocations, and other recommendations for solving problems encountered with respect to reading alignment. The evaluation will be conducted by an external evaluator as provided in the Monitoring Committee portion of this order.

At the secondary level, reading comprehension is of central importance in improving student achievement. The degrees of reading power program (DRP) was intended to be a tool to assist in improving student achievement and producing independent learners. It appears, however, that problems have been encountered in implementing the DRP program. Based on the formative evaluation report submitted to the Monitoring Committee in February of 1986 there is uncertainty about the program's leadership, a lack of teacher involvement outside the areas of English and reading, lack of instructional support, missing computer hardware and a lack of clarity regarding the program's philosophy and district commitment.

In view of the importance of reading comprehension at the secondary level, an additional progress report on the DRP program will be prepared and submitted by KCMSD to the Monitoring Committee on or before July 15, 1986 describing critical actions, time schedules, deadlines, resource allocations and other details of a plan for solving problems encountered with respect to the DRP program.

Another major intervention program designed to improve secondary school student's performance is the school within a

school (SWAS) program. A February, 1986 evaluation made numerous recommendations regarding the effective implementation of SWAS including the development of a coordinated curriculum for each of the SWAS areas; improvement in policies and procedures, provision of adequate materials, supplies and equipment, and improvement of staff development. KCMSD is ordered to submit a detailed plan for improved implementation of the SWAS program in 1986/87. This report should be submitted to the Monitoring Committee on or before August 1, 1986. The report shall include details concerning how much time of individual personnel involved will be devoted to SWAS program, as well as details on funding, staffing, staff development and time schedules for 1986/87.

### *Voluntary Interdistrict Transfer*

■ The State of Missouri was given the responsibility for actively seeking the cooperation of each school district in the Kansas City, Missouri metropolitan area in a voluntary interdistrict transfer program (VIDT). On June 4, 1986, the State of Missouri provided this Court with written responses from eleven suburban school districts. All school districts stated that they were not interested in becoming involved in a transfer program at this time. Several of the districts stated that their refusal to participate was based upon the pending litigation between KCMSD and themselves.

Some communication between the State and the Missouri suburban districts must be conducted confidentially. However, as an arm of the Court, the Monitoring Committee has the responsibility for overseeing what progress is being made in each of the components of the desegregation remedial plan including VIDT. The Committee cannot function, and thus the Court cannot properly respond, unless the parties provide it with sufficient information.

Beginning immediately, the State of Missouri shall renew contacts with the Board of Education of the individual Missouri suburban school districts in the Kansas City, Missouri metropolitan area concerning a voluntary interdistrict transfer program. The State will actively seek the cooperation of those districts in establishing such a program. In addition, the State shall seek to identify the present policy of each district in regard to accepting students on a tuition basis from outside their district, the conditions under which the district would consider participation in a voluntary transfer program, the number of students the District will be interested in accepting from KCMSD and the number of students who may transfer to the KCMSD. Furthermore, the State of Missouri shall report on the effort that has been made with each district and the results of those efforts. The reports will be due on or before October 1, 1986, January 9, 1987 and a final report will be due by May 29, 1987. Communication between the State and the districts will be kept in the strictest confidence by all parties to the communication and by all members of the Monitoring Committee.

Since the voluntary interdistrict transfer program could provide a significant opportunity for additional desegregation of KCMSD schools as well as desegregative educational experiences for KCMSD students, the State of Missouri must demonstrate that they are seriously committed to seeking the cooperation of each suburban school district in the Kansas City, Missouri metropolitan area. If the State does not demonstrate its commitment, then this Court will seek other methods of accomplishing this task at the State's expense. While recognizing that pending litigation does impact upon the suburban District's decision, the State should explore with suburban districts the conditions under which they would consider participation in order to reap the educational and financial benefits that are a part of this program.

### *Desegregation Monitoring Committee*

■ The Desegregation Monitoring Committee is an arm of this Court. A request for information from the Committee should be treated by all parties as a request for information from this Court.

Upon receipt of a request for information a party will respond in a prompt and thorough manner. If additional time is needed, an immediate request for such should be made to the Committee and the Committee is instructed to grant extensions of time when reasonable. However, if a party determines that it will not respond to a request for information from the Committee, for whatever reason, the party should immediately inform the Court of its intention, specifically stating the reasons.

The Committee has shown itself to be an effective and impartial group committed to achieving the goals outlined in this Court's plan. Cooperation by all parties with the Committee will assist everyone in achieving the goals of the plan and is viewed by this Court as a responsibility which every party has.

In order to continue the functions outlined by this Court in the June 14, 1985 order the budget for the Monitoring Office will be increased from its present level of $142,200 to a total of $187,950. Funds for the budget will come exclusively from the State of Missouri. This $45,750 increase represents a $4,000 increase in the operating budget, a 2½% increase in salaries and fringe benefits, and a $40,000 increase in research funds. The $40,000 research pool may be utilized by the Committee for the purpose of completing specific research projects. There will be no change in the per diem budget for Monitoring Committee members; the Court is aware that there may be a variation in the amount of time spent by members of the different committees, therefore during the budget year, which begins July 1, 1986, if the Executive Committee deems necessary, it may request from this Court approval of a reallocation of funds in order to insure that sufficient per diem allocations are made for individual committee members.

### Reallocation of Year One Budget

KCMSD has requested authorization from this Court for reallocation of funds under the full day kindergarten component. Enrollment in the full day kindergarten program was greater than originally anticipated resulting in a number of class sizes in excess of 25 students. KCMSD had 3,308 students enrolled in kindergarten as of January, 1985. In January of 1986 this number had increased to 3,363. Additional kindergarten teachers were needed because of this enrollment increase. As a result, the KCMSD hired 41 additional teachers, rather than the 39 additional teachers included in the June 14, 1985 order. KCMSD will be allowed to reallocate funds in the year one budget and pay for the two additional teachers hired for the full day kindergarten program out of the desegregation plan. In addition any remaining unallocated funds from the year one budget may be used to purchase furnishings and equipment for the added kindergarten rooms. However, the total amount of funds to be spent during the year one budget shall not exceed $1,092,000 with KCMSD and the State of Missouri paying equal shares of the total amount expended.

### Salary Schedule

The June 14, 1985 order stated that in hiring personnel the KCMSD would be limited to a maximum cost of $28,000 for professional staff including fringe benefits. The maximum cost for individual teacher aides was to be $9,500 including fringe benefits. KCMSD is required to pay new personnel according to existing salary schedules. The District is now seeking a change in the June 14, 1985 order which would remove the cap on salaries set at $28,000 for professionals and $9,500 for teacher's aides and instead utilize those figures as averages. KCMSD's request will be granted and the District will be limited to an average cost of $28,000 for professionals including fringe benefits and $9,500 for teachers aides including fringe benefits. However, the total amount of funds which were budgeted for the affected components will not be increased. The KCMSD shall continue to charge the least expensive personnel to the desegregation budget when multiple hirings occur.

*Capital Improvements*

A comprehensive capital improvement study has been completed by KCMSD and a report presented to the Monitoring Committee and this Court, detailing specific capital improvement needs by school. The original $37,000,000 budgeted in year one of the desegregation plan has been allocated toward the most critical capital improvement needs of the District. In the June 14, 1985 order this Court took note of the deteriorating conditions of the District facilities including safety and health hazards, educational environment impairments, functional impairments as well as impairments in the appearance of the facilities. This Court also found that improvement of school facilities is an important factor in the overall success of this desegregation plan and ordered the District to complete a study to determine what needed to be done in order to bring its facilities to a point relatively equal with the facilities in neighboring suburban school districts. This Court reserved judgment in the June 14th order as to whether additional expenditures for capital improvements beyond the initial $37,000,000 would be required to be made by the State of Missouri. At that time the Court also stated that after the capital improvements have been made it would be incumbent upon KCMSD to include in its budget funds for the maintenance of those improved facilities.

This Court will order additional capital improvements to be made. The State of Missouri will pay for these additional improvements. The Court authorizes the expenditure of up to $4,063,154 for capital improvements as outlined in the capital improvement study for schools in the Southwest Cluster. The Court authorizes the expenditure of up to $3,468,004 for the Swinney and Volker Elementary Schools. Finally, the Court authorizes the expenditure of up to $5,346,172 at the Lincoln North Academy. Total capital improvement expenditures to be paid for by the State are $12,877,330. In order to complete these capital improvements without displacing students from those schools the District is authorized to use up to a maximum of $480,000 of these funds for the purchase of classroom modules, if absolutely necessary. The District will be required to provide reports on at least a quarterly basis, beginning August 1, 1986, to the Monitoring Committee on progress being made in completing the capital improvements at the designated schools. Specifically these reports should detail the amount of work completed, the amount of funds expended, and the balance of work to be done. In addition, the District shall present on or before January 5, 1987 a plan to the Monitoring Committee detailing how the District will maintain the capital improvements made as a result of the desegregation plan, including last year's work. This report will include budget estimates and how the District plans to raise sufficient funds for the maintenance of the improved facilities. The District shall also report to the Monitoring Committee on or before January 5, 1987 on the need for future capital improvements. Specifically the District shall present a report outlining what capital improvements remain to be done, the amount of funds required to achieve these improvements and a timetable. The report shall specifically detail what components of the capital improvements plan are considered by the District to be related to eliminating safety and health hazards, what portions are related to correcting conditions existing in the facilities which impede the level of comfort needed for creating a good learning climate, and what portions of the improvements relate to making the facilities visually more attractive.

*Magnet Schools*

 Magnet schools can be utilized to assist in expanding the desegregative educational experience for KCMSD students. A key to success is the commitment of the Board of Education, the superintendent, the administration, the staff of the schools, and the parents and patrons. That commitment, when coupled with quality planning and sufficient resources can result in the establishment of magnet schools which can

attract non-minority enrollment as well as be an integral part of district-wide improved student achievement.

KCMSD has presented to the Court a magnet school proposal for school term 1986/87. This proposal would include the three schools of the Southwest Cluster Investigative Learning Magnet, the Westport Community Applied Learning Magnet and the Lincoln College Preparatory Magnet. The themes, staffing, curriculum and budget are based upon thorough area-wide surveying in compliance with this Court's June 14, 1985 order. The plan incorporates input from parents, patrons and professionals from throughout the District. It has substantial support within the KCMSD and has the potential for demonstrating the central administration's ability to effectively implement and manage substantial educational improvements within the District.

The long term goal of this Court's remedial order is to make available to *all* KCMSD students educational opportunities equal to or greater than those presently available in the average Kansas City, Missouri metropolitan suburban school district. In achieving this goal the victims of unconstitutional segregation will be restored to the position they would have occupied absent such conduct, while establishing an environment designed to maintain and attract non-minority enrollment. A review of this magnet school plan has been conducted in light of this goal. While the resources requested are substantial, the constitutional violations found to exist were also substantial. While the number of individual students benefited during the first year of the magnet school program will not be large, the individual benefit for each of those students will be very large and the long term benefit to the District is worthy of such an investment. Therefore, this Court is ordering the implementation of the Kansas City, Missouri School District's magnet school plan with specific modifications.

At the Southwest Cluster KCMSD shall institute a fully magnetized school program in school term 1986/87. This program will include an extended year program with a budget of $423,500. The budget for nonsalary items will be $497,820. The personnel budget will be $3,777,116. This is a reduction in the amount of funds requested for personnel. The goals established for student teacher ratios within the magnet school plans will be deleted from the plan. The goals established for reduced class size in the June 14, 1985 order will be substituted in their place. In order to meet the goals established for student teacher ratios in the June 14, 1985 order the District will use funds over the next two school terms made available from the reduced class size component of the desegregation plan. However, the reduced class size component of the plan is a district wide component and the goals established shall be reached throughout the District without preference to magnet schools. These reduced class sizes, ones which were presented for adoption by KCMSD are more than sufficient to provide quality educational opportunities, individualized attention, and attract both minority and non-minority enrollment. Enrollment shall be as outlined in the magnet school plan. Therefore, the total operating budget for the Southwest Cluster Investigative Learning Magnet will be $4,698,436. The District will be required to pay for $2,590,598 and the State will be required to pay $2,107,838.

The Court will order the implementation of the Westport Community Applied Learning Magnet consisting of Swinney and Volker Elementary Schools. Total budget for the Westport Magnet School will be $3,522,031. Non-salary items will be budgeted at a maximum of $357,082 with the extended year program budget being $423,-500. Personnel costs shall be limited to $2,741,449 with the same limitations on student teacher ratios as outlined previously in regard to the Southwest Cluster. The goals established for student teacher ratios in the June 14, 1985 order will be used for the magnet schools and funds from the reduced class size component over the next two school terms shall be utilized in order to reach those goals. KCMSD will be required to fund a total of $1,703,259 for

Swinney Volker with the State paying $1,818,772.

The Court will order the implementation of the Lincoln College Preparatory Magnet Program in the school term of 1986/87. The total budget for this program will be $4,152,260. The non-salary component of the budget will be $1,318,493 and the extended year program will have a budget of $90,000. Personnel costs will be no more than $2,743,767 with the same limitations placed on personnel as outlined for the previous magnet schools. That is, that the goals established in the June 14, 1985 order in regard to reduced class sizes shall be inserted in place of the goals established in the proposed magnet school plan. Funds shall be made available from the reduced class size component over the next two school terms in order to reach those goals. KCMSD will be required to pay $1,723,246 of the total Lincoln Magnet School budget with the State being required to pay a maximum of $2,429,024.

Quality planning, commitment of the superintendent and administrators, and responsible management, are absolutely necessary to insure that the resources approved by this Court for magnet schools are effectively and efficiently used to reach the goals of the remedial plan. Therefore, this Court will authorize a budget of $600,-000 for administration of the magnet school program. Specifically, $164,835 will be allowed for central administration with $435,-165 being made available for marketing and for planning to avert resegregation. This cost will be evenly borne by the State and the District.

The total amount of funds budgeted for the magnet school program will be $12,-972,727 with the District paying $6,317,093 and the State paying $6,665,634.

In implementing the magnet school program in school term 1986/87 the District shall utilize the same desegregation goals for kindergarten that have been established for other grades and schools. The goal established for desegregative enrollment of 50% minority and 50% non-minority shall be measured on the grade and school level and not only on the elementary cluster level. The training provided for the staff of these magnet schools is extremely important and at least 70 hours of the total training package shall be conducted prior to the beginning of the school term with the total training package being approved by the Monitoring Committee prior to its implementation. Therefore, the training program shall be submitted for review and action by the Committee on or before July 25, 1986. Furthermore, the District shall utilize its standard involuntary transfer policy and procedures in regard to the vacated positions at these schools and shall adhere to the work day length agreement reached between the District and the AFT Local 691.

Further development of the magnet school program must be based upon making magnet schools an integral part of an overall effort to improve educational achievement. The magnet plan must be geared toward both remedial and desegregative goals and should maximize achievement of desegregation with a minimum amount of resources. The magnet program should provide long term stability in terms of future financing as well as incorporate a carefully designed marketing program based upon a clearly defined themes and curriculums. Finally, a quality magnet program should be based upon a careful analysis of the plans' impact upon other components of the desegregation plan. Thus, future development of a magnet school program need not duplicate this initial phase of the magnet school effort. The District should provide to the Monitoring Committee and all parties a copy of their comprehensive magnet school program proposal on or before August 1, 1986. It will be measured against the criteria as outlined in this order.

*Financing Summary*

Following is an outline of the year two desegregation budget:

| | KCMSD | STATE | TOTAL |
|---|---|---|---|
| All Day Kindergarten | 797,248 | 797,248 | 1,594,496 |
| AAA | 4,053,317 | 4,737,380 | 8,790,697 |
| Before & After School | 52,200 | 52,200 | 104,400 |
| Effective Schools | | 5,275,000 | 5,275,000 |
| Summer School | 598,000 | 598,000 | 1,196,000 |
| Reduced Class Size | | 4,000,000 | 4,000,000 |
| Capital Improvements | | 12,877,330 | 12,877,330 |
| Administration | | 30,000 | 30,000 |
| Monitoring Committee | | 187,950 | 187,950 |
| Magnet Schools | 6,317,093 | 6,655,634 | 12,972,727 |
| Voluntary Interdistrict Transfer | open | open | open |
| Student Reassignment | open | open | open |
| Early Childhood Development | 775,893 | 775,893 | 1,551,786 |
| TOTAL | 12,593,751 | 35,986,635 | 48,580,386 |

Except in the full day kindergarten component, any carryover from year one shall be used to fulfill year two budget requirements within the component.

### CONCLUSION

All parties, and all persons delegated with the responsibility for implementation of any portion of this plan, should clearly understand that this Court expects the plan to be implemented in a thorough and efficient manner. Whether agreeing or disagreeing with its individual components, the parties must comply with this plan as much as any statute and this Court will require each party and all individuals delegated with responsibilities for implementation to make a diligent effort, to carry out this plan. Failure to make a diligent effort may result in sanctions against a party or individual.